Per Curiam :
 

 This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law. Tbe commissioner bas done so in an opinion and report filed on August 16, 1965. Plaintiff requested tbe court to adopt tbe trial commissioner’s findings of fact with certain additions and excepted to his recommendation for conclusions of law. Defendant requested that tbe court adopt both tbe findings of fact and tbe recommended conclusions of law. The case was submitted to the court on tbe briefs of tbe parties and oral argument of counsel. Since tbe court is in agreement with tbe trial commissioner’s findings, opinion and recommendation for conclusions of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover and tbe petition is dismissed.
 

 
 *495
 
 OPINION OE COMMISSIONER
 
 *
 

 Hogenson,
 
 Commissioner:
 
 This is a suit for refund of excise taxes alleged to have been erroneously assessed against and collected from plaintiff, a Florida corporation formerly engaged in the business of selling Volkswagen automobiles at retail. The statute under which the pertinent tax is imposed, 26 U.S.C. (I.E.C. 1954) §4061 (1958 Ed.),
 
 [1]
 
 places a tax (called a manufacturers excise tax) not on the act of importation, but on the first sale in the United States of an automobile imported from abroad.
 
 Indian Motocycle Co.
 
 v.
 
 United
 
 States, 283 U.S. 570, 574 (1931). Thus, whether plaintiff was the “importer” liable for the excise tax on the Volkswagen automobiles involved in this case is to be determined by resolution of the issue as to whether plaintiff under the statute was the first purchaser in the United States of such imported automobiles.
 
 Handley Motor Co.
 
 v.
 
 United
 
 States, 168 Ct. Cl. 92, 98, 338 F. 2d 361, 364 (1964).
 

 claim: eor refund
 

 However, it would seem that the court should first decide the threshold question as to whether it has jurisdiction to entertain this case on the merits in view of defendant’s challenge that plaintiff never filed a claim for refund as required by statute, 26 U.S.C. (I.R.C. 1954) § 7422 (1958 Ed.)
 

 [2]
 

 
 *496
 
 On January 27, 1960, the District Director of Internal Revenue, Jacksonville, Florida, seized certain of plaintiff’s automobiles at its lot in Miami, Florida, after having made and issued a jeopardy assessment against plaintiff for excise taxes due on its sales of imported automobiles in the fourth quarter of 1959. The jeopardy assessment was in the sum of $62,100, and the value of the seized automobiles is allegedly $12,291.86.
 
 [3]
 

 The jeopardy assessment and seizure of the automobiles were protested by plaintiff by filing Internal Revenue Service Form 843 with the District Director on February 10,1960. The form as executed, recites that the claim pertains to a jeopardy assessment in the amount of $62,100 for manufacturers excise taxes for the period from October 1, 1959, through December 31, 1959. The claim form states that no payment for the tax had been made, that there was no amount to be refunded, but the amount to be abated was $62,100. Form 843 is and was the same form used for refund of taxes paid, for refund of amounts paid for revenue stamps, and for abatement of taxes assessed but not paid.
 

 Attached to the Form 843 claim filed by plaintiff were several documents made part of the claim by reference language on the claim form. Among the attachments are (1) a sworn statement of plaintiff’s president, stating the same grounds for abatement of the tax as are urged by plaintiff for refund of tax in this case, and (2) a letter from plaintiff’s attorney, stating in pertinent part:
 

 I respectfully urge that in order to mitigate the damages that we have already been caused to suffer (Which I must inform you that I shall hold your Department personally liable for) by what we have urged upon you is an unjust and illegal tax lien and Jeopardy Assessment, that you immediately release the lien and assessment and return to us our rightful property.
 

 
 *497
 
 In April and May 1960, the Internal Revenue Service sold plaintiff’s automobiles which had been seized following the jeopardy assessment. Proceeds from this sale amounted to about $9,243.88, no part of which has been refunded or made available to plaintiff. No further claim or amendment to the F ebruary 10,1960, claim was filed by plaintiff.
 

 The District Director disallowed plaintiff’s claim in full by form letter, dated April 20,1961. This letter states that it is in reply to a “claim for refund” of manufacturers excise taxes in the amount of $62,100 for the period ending December 31, 1959.
 

 In
 
 Ertle
 
 v.
 
 United
 
 States, 118 Ct. Cl. 57, 93 F. Supp. 619 (1950),
 
 [4]
 
 this court considered a predecessor statute like the claim for refund statute involved in this case, and ruled that the court lacked jurisdiction to entertain a suit by taxpayers to recover sums of money paid as statutory penalty assessments for willful nonpayment of excise taxes. In that case, taxpayers had filed claims for abatement of the penalty assessments with the Collector of Internal Revenue; such claims were denied prior to payment; taxpayers then paid the penalties under protest, as stated on the receipt issued to them; but after payment, no claim for refund was filed. This court declined to construe either the protest or the claim for abatement as being a compliance with the claim for refund statute.
 

 However, this case is distinguishable from the
 
 Ertle
 
 case in that plaintiff herein in its claim for abatement set forth the necessary elements for refund, and the claim was so treated by defendant. Plaintiff asserted “some form of request for refund” which “made available sufficient information as to the tax and year to enable the Internal Revenue Service to commence, if it wishes, an examination into the claim.”
 
 American Radiator & Standard Sanitary Corp.
 
 v.
 
 United
 
 States, 162 Ct. Cl. 106, 114, 318 F. 2d 915, 920 (1963), and numerous cases therein cited and discussed. Here, the plaintiff’s claim requested “return” of its “rightful property” and asserted clearly that it was not the first purchaser in the United States of the imported automobiles,
 
 *498
 
 and that it was therefore not liable for the excise taxes assessed on the sale of such automobiles during the last quarter of 1959, the tax period involved in this case. Once the District Director had sold the seized automobiles, it was reasonable for him to treat plaintiff’s request for return of the seized automobiles as a claim for refund of the proceeds of the sale. His use lof the “claim for refund” form letter to give notice of denial of plaintiff’s claim is reasonably understood on this basis. Defendant’s contention that ¡such form was used ¡by mistake is not supported by substantial evidence and is contrary to the reasonable inferences to be drawn from the facts and circumstances in evidence.
 

 At the time 'of the filing of plaintiff’s claim on Form 848 with the included attachments, the District Director had plaintiff’s automobiles in his possession; plaintiff’s claim fully advised the District Director as to the nature of the tax in dispute and the taxable period involved, and requested return of the automobiles, asserting in detail grounds therefor; the automobiles were thereafter sold; and the District Director then reasonably treated plaintiff’s claim as a claim for refund. See
 
 Continental Illinois Nat. Bank & Trust Co.
 
 v.
 
 United
 
 States, 94 Ct. Cl. 126, 39 F. Supp. 620 (1941), and cases therein cited. It is concluded that plaintiff’s claim was sufficient to satisfy the requirements of the claim for refund statute, and that the court has jurisdiction of the sub ject matter of plaintiff’s petition.
 

 IMPORTER 03? VOLKSWAGEN S
 

 Both plaintiff and defendant rely upon the ruling of this court in
 
 Handley Motor Co.
 
 v.
 
 United
 
 Slates, supra, that the first purchaser in the United States of imported Volkswagen automobiles is the “importer” liable for the excise taxes to be paid under section 4061 of the Internal Revenue Code of 1954. Plaintiff basically contends that a New York corporation, Deeren Trading Corporation, not plaintiff, was the first purchaser of the 'imported Volkswagens involved in this case, and that plaintiff was therefore not liable for the excise taxes on subsequent sales of such automobiles. Defendant contends that Deeren was in reality plaintiff’s agent in the
 
 *499
 
 importation of the Volkswagens, and that plaintiff was in fact the importer or first purchaser in the United States.
 

 For consideration of the respective contentions of the parties, it is necessary to review in detail the facts and circumstances relating to the formation and operation of both Deeren and plaintiff and the relationship between them on the importation of the pertinent Volkswagens.
 

 In early 1951, Charles Kirkiles met Menas Petrides in New York City at the office of Pelagic Company, Ltd., ¡being introduced by George Stathos, principal stockholder and officer of Pelagic. Kirkiles, a stockholder in Pelagic, was a partner in an accounting firm which had Pelagic as a principal client, and Kirkiles maintained a branch office for his firm, located next to the Pelagic suite.
 

 Petrides, a Greek national, 'had migrated to California after World War II, and arrived in New York City with limited means. Stathos could offer him no employment, but permitted him to use desk space in the offices of Pelagic, with the understanding that Petrides would try to set up an import business, and Stathos would share in the profits. From 1957 to mid-1959, Petrides had no regular employment, maintained himself on limited savings brought from California, loans from Stathos, fees for translating documents, and other odd jobs. In mid-1959, he became sole agent and owner of the Deeren Trading Corporation, from which he received neither salary nor dividends. In February 1960, he suddenly left the United States without funds and has been in South America ever since.
 

 In the meantime, Petrides had repeatedly discussed with Kirkiles the business of importation of various goods and articles from South America and Japan, and also the importation of Volkswagen automobiles from Germany. Kir-kiles maintained export-import accounts for some of the clients of his accounting firm, and learned to appreciate the possible profits to be realized from importing compact automobiles.
 

 By early 1959, Pelagic had failed and closed its offices, and George Stathos was residing in Germany. Petrides was without office space or even a telephone in his apartment,
 
 *500
 
 and used Kirkiles’ office as a mailing address and place to receive messages.
 

 •In March 1959, Kirkiles went to Hamburg, Germany, where he met a German attorney, Dr. Georg Constant, who expressed his intention to migrate to the United States, and asked Kirkiles about business opportunities there. Among other suggestions, Kirkiles discussed importation of Volks-wagens for sale at retail. Constant then introduced Kir-kiles to Charles Feit, an American visiting in Germany, who had had considerable experience in the automobile business in the United States.
 

 Discussions between Kirkiles, Constant, and Feit concerning Volkswagen sales in the United States were held for a number of days, including one weekend when they together visited Stathos at a nearby resort where he was recovering from an illness. The three men tentatively decided to avoid any effort to obtain a franchise from an authorized Volkswagen distributor in the United States but to explore the possibilities of establishing a Volkswagen sales business in Miami, Florida, with used Volkswagens supplied in shipments from Germany to a port at or near Miami, Florida. Since Baltimore, Maryland, was the southernmost port receiving Volkswagen shipments in the United States, they believed that receiving such shipments at Miami would place them in a favored position for sales in the south.
 

 Kirkiles and Feit returned to the United States, and thereafter from April through August 1959, engaged in numerous conferences with officers (including an uncle of Feit) of the Central Bank and Trust Company at Miami, Florida. Their discussions concerned amount of financing Central would provide for the purchase of Volkswagens, method of payment for the automobiles, who would supply the automobiles, Central’s finance charges, and how repayment of loans would be made to Central. It was agreed that the three promoters of the proposed business would deposit $50,000 with Central and that the bank would open a $250,000 credit account for the corporation to be formed.
 

 
 *501
 
 Plaintiff was incorporated as a Florida corporation in August 1959, with the three ■promoters as its officers and stockholders in respective proportion of shares, as follows:
 

 Feit, president, 25 percent Kirkiles, vice president, 25 percent Constant, secretary-treasurer, 50 percent
 

 3h the summer of 1959, Kirkiles proposed to Petrides that the latter take over Deeren Trading Corporation, the organization of which had been undertaken by Kirkiles, his brother, and the members iof a New York law firm, but concerning which no capital contributions had been made or stock issued. Incorporation of Deeren was completed that summer, with Petrides as the owner and thereafter the sole employee thereof. Deeren’s office was in New York City in the same space with that of Emerson Trading Corporation, which had been formed and was solely owned by Stathos. Emerson had remained dormant until June 1959, when Stath-os referred Petrides, as the unpaid agent of Emerson, to Hans K. Luer, a German exporter of Volkswagens, and Petrides then used Emerson as the importer in placing a New York automobile dealer’s order with Luer, although the corporate purpose of Emerson was not the importation of automobiles. Kirkiles apparently aided Petrides in arranging this transaction.
 

 Kirkiles’ firm was engaged by Deeren as its accountant. Deeren had practically no assets, and its office space was paid for by Emerson.
 

 On August 19, 1959, Deeren, as seller, and plaintiff, as purchaser, entered into a written agreement, whereby plaintiff agreed to purchase from Deeren a minimum of 100 and a maximum of 300 used Volkswagen automobiles per month for a “competitive market price” plus $5 for each automobile. The “competitive market price” is therein defined to include the bank lien, or invoice cost of the automobile, customs duty, freight charges, and customs brokers’ fee. The agreement further provides that the $5 per automobile be paid directly to Deeren and that plaintiff pay all other costs and expenses “directly at the request” of Deeren.
 

 
 *502
 
 The automobiles ordered by Deeren from Luer for plaintiff were shipped to a port of entry in or nearby Miami. From the $250,000 account held by Central for plaintiff’s purchase of automobiles, Central forwarded to its correspondent New York bank, which was the assumed agent for Deeren, a letter of credit in an amount sufficient to cover the cost of the automobiles and expenses of shipment. The letter of credit was expressly made irrevocable and assignable, and for each order of automobiles it was assigned and returned to Central in Miami. The purpose of the assignment was to accomplish payment for the shipment of automobiles upon arrival at the port of entry.
 

 In all cases, the exporter forwarded all documents of ownership for the Volkswagens to the New York bank in the name of Deeren as importer and buyer. The indicia of ownership were not released to Deeren, however, but were forwarded to Central, which had banker’s liens on the automobiles. Upon arrival of the automobiles, Deeren through its New York 'bank, which forwarded the German titles to the Volkswagens, directed 'Central to remit payment to a designated German bank for the automobiles and to the customs broker for his services in connection with clearance. Payments were made by Central from the account derived from the assigned letter of credit, and title was simultaneously transferred to plaintiff. The physical possession of the title documents, however, remained with Central, which held trust receipts on the Volkswagens against the original loan of $250,000. When the automobiles were sold at retail to plaintiff’s individual customers, title was transferred to the name of the customer and delivered to him or to his bank, if he chose to finance the purchase. From the individual sales by plaintiff, Central recouped its loan made to plaintiff for the purchase of the automobiles.
 

 All documents in evidence forming part of the process of importation in the United States, agreements to sell, bills of lading, customs invoices, seller’s (exporter’s) invoices, broker’s statements, designate Deeren either as the “importer of record,” or the “purchaser,” or the “party whose account is to be charged.” None of the same documents indicates that plaintiff assumed any risk in the importation of the vehicles
 
 *503
 
 into the United States. In any event, the risk was minimal in view of the fact that marine insurance was carried on the shipments while in transit. Although it does not appear in whose name the insurance was carried (Kirkiles called it a %earer policy” in his testimony), it is inferred from the facts attendant to the agreement between Deeren and plaintiff that the insurance cost was 'borne by plaintiff.
 

 Deeren imported some Volkswagens and sold them to automobile dealers other than plaintiff, but such dealers must have paid to Deeren much more than $5 per automobile, although there is no evidence as to what arrangements Deeren had with such customers. Petrides had agreed on the profit arrangement between Deeren and plaintiff on the basis of plaintiff’s anticipation that it could handle 200 Volks-wagens per month, and on this basis, Deeren would realize a steady income of $1,000 per month, sufficient to pay Deeren’s overhead and a salary for Petrides, leaving the latter free to negotiate contracts with other automobile dealers to the profit of Deeren.
 

 Hans Luer was the only German supplier of automobiles with whom Deeren dealt. The record discloses no direct contact between Luer and plaintiff. However, Deeren in no instance placed an order with Luer without a prior commitment for purchase by plaintiff or some other dealer. There was no negotiation for price between Deeren and Luer. Petrides simply placed the American dealer’s order with Luer in Deeren’s name, and he was subsequently advised of shipment date, Petrides designated Deeren’s role in the transaction with Luer as purchaser “on a consignment basis.” Until the invoices from Luer were received by the New York bank and forwarded to Central, neither Deeren nor plaintiff knew the cost for the shipment. Plaintiff at that time added up all of the charges on the shipment, divided the total sum by the number of automobiles in the shipment, and thus determined whether or not the price per unit was satisfactory. If such price was within market price limitations, plaintiff then accepted and purchased the shipment.
 

 As each shipment of Volkswagens arrived in or near Miami, clearance was arranged by a customs broker who was paid
 
 *504
 
 by Central for plaintiff’s account. Plaintiff’s employees then took possession of such automobiles and delivered them to plaintiff’s lot for sale at retail.
 

 After Central had paid the German bank designated by Luer for payment for the shipment, plaintiff then sent Deeren a check equal to $5 for each automobile received. Invoices purporting to be bills of sale form Deeren to plaintiff are in evidence and indicate the total cost for the shipment, less the price paid to the German bank for the automobiles and less other related costs, such as customs duties, freight, and customs brokers’ fees paid by Central at the direction of Deeren from plaintiff’s account, and showing the net balance due Deeren. This last item is in every case the $5 per automobile profit to Deeren. Only this amount was actually paid to Deeren. The checks in payment were prepared by Kirkiles, who was accountant for both plaintiff and Deeren, and in some instances Kirkiles endorsed the checks for deposit to Deeren’s bank account.
 

 In the
 
 Hamdley Motor
 
 case,
 
 supra,
 
 the plaintiff taxpayer was, like plaintiff herein, the retail automobile dealer who received and spld imported Volkswagens. Handley was held to be the importer. There, however, the import documents named Handley as the importer, consignee or recipient, whereas here, plaintiff was not mentioned therein. There, the broker Amerifact was not named in such documents and did not enter into the -chain of title, whereas here, the so-called counterpart of Amerifact, Deeren, was named in the import documents as the importer, consignee tor recipient. A further distinction relied upon by plaintiff and supported by the evidence herein is that there, Handley had no sales agreement with Amerifact, whereas here, there existed an agreement between Deeren, as seller, and plaintiff automobile dealer, as purchaser, with respect to the imported Volkswagens.
 

 Plaintiff contends that these distinctions require a holding pursuant to
 
 Handley
 
 that plaintiff herein was not the first purchaser of the imported Volkswagens.
 

 However, the essence of the
 
 Handley
 
 ruling seems to be that the determination of who is the “importer” under the pertinent statute does not turn on technical rules such as
 
 *505
 
 tbe law of sales, but rather on the realities as to who arranges as principal and not as agent for the articles to be imported into the United States.
 

 This theme of the
 
 Handley
 
 opinion conforms with a well recognized principle of tax law succinctly stated by the Supreme Court in
 
 Higgins
 
 v.
 
 Smith,
 
 308 U.S. 473, 477 (1940), as follows:
 

 * *_ * A taxpayer is free to adopt such organization for his affairs as he may choose * * *
 

 On the other hand, the 'Government may mot be required to acquiesce in the taxpayer’s election of that form for doing business which is most advantageous to him. The Government may look at actualities and upon determination that the form employed for doing business or carrying out the challenged tax event is unreal or a sham may sustain or disregard the effect of the fiction as best serves the purposes of the tax statute. To hold otherwise would permit the schemes of taxpayers to supersede legislation in the determination of the time and manner of taxation. It is command of income and its benefits which marks the real owner of property.
 

 In
 
 Hooven & Allison Co.
 
 v. Evatt, 324 U.S. 652, 661-663, (1945), involving constitutional immunity of imports from state taxation, the Ohio Supreme Court had ruled that petitioner was subject to a state ad valorem tax on certain bales of hemp imported from the Philippine Islands. An issue in the Supreme Court was whether the Ohio Supreme Court had erred in 'holding that petitioner was not the importer because it acquired title to the imported goods after their arrival in this country. The goods were shipped to the United States on consignment to a broker, and title was secured in a bill of lading delivered to the broker or a bank. In reversing the Ohio Supreme Court, the Supreme Court stated:
 

 * *
 
 *
 
 Petitioner’s contracts of purchase are the inducing and efficient cause of bringing the merchandise into the country, which is importation. Examination of the documents and consideration of the course of business can leave no doubt that the petitioner not only causes the importation but that the purpose and necessary consequence of it are to supply petitioner with the raw material for its manufacture of cordage at its factory in Ohio, [at p. 661]
 

 
 *506
 
 Concerning tbe meaning of importation, in the constitutional sense, the Supreme Court further stated:
 

 For the purpose of determining whether petitioner was the importer in the constitutional sense, it is immaterial whether the title to the merchandise imported vested in him who caused it to be brought to this country at the time of shipment or only after its arrival here. * * * For in determining the meaning and application of the constitutional provision, we are concerned with matters of substance, not of form. When the merchandise is brought from another country to this, the extent of its immunity from state taxation turns on the essential nature of the transaction, considered in the light of the constitutional purpose, and not on the formalities with which the importation is conducted or on the technical procedures by which it is effected. It is common knowledge to lawyers and businessmen that vast quantities of merchandise are annually imported into this country by purchasers resident here, for sale or manufacture here. Sometimes the buyer completes the purchase abroad, in person, and ships to this country ,■ sometimes, as in this case, the purchase is on unsecured credit, but more often it is under contracts by which the vendor reserves in himself or his agent or a banker a lien or title as security for payment of the purchase price on or after arrival. To say that the purchaser is any the less an importer in the one case than in the others, is to ignore the constitutional purpose and substitute form for substance. [at pp. 662-64]
 

 The principle that tax statutes should be construed on the basis of the substance of transactions and events rather than methods of accomplishment has been applied in cases determining who is the “manufacturer” of an article subject to excise tax under a statute like or similar to the one involved in this case. Thus, where one person manufactures or produces a taxable article for another who furnishes materials and retains title thereto, the latter for whom the article is manufactured or produced, not the actual manufacturer, is considered to be the “manufacturer” under the excise tax statute if the substance of the arrangements warrants such holding.
 
 Record Guild of
 
 America,
 
 Inc.
 
 v.
 
 United States,
 
 145 Ct. Cl. 686, 690, 172 F. Supp. 676, 679 (1959). The patent holder, not the fabricator, was held to be the “manufacturer” and first seller of the fabricated article, even though
 
 *507
 
 there was an agreement between the fabricator, as seller, and the patent holder, as buyer, concerning the fabricated article.
 
 Polaroid Corp.
 
 v.
 
 United States,
 
 285 F. 2d 276, 278 (1st Cir. 1956),
 
 cert. denied
 
 352 U.S. 953 (1956);
 
 Charles Peckat Mfg. Co.
 
 v.
 
 Jarecki,
 
 196 F. 2d 849, 851 (7th Cir. 1952),
 
 cert. denied
 
 344 U.S. 875 (1952).
 

 As is apparent in plaintiff’s 'briefs, plaintiff’s case is based on the form or method of accomplishment of the events and transactions involved in the importation of the pertinent Volkswagens, that is, the issuance and the processing of the technical, formal, and legalistic papers, such as the export invoices, banker’s liens, letters of credit, and the like. The overall substance of the importation of the automobiles, however, is that all of the technicalities of the import procedures were as a matter of fact subordinate to and geared to the supply by plaintiff of all funds necessary to accomplish the importation. Deeren supplied none of such funds. For the risks and responsibilities assumed by Deeren, its $5 income per automobile was plainly adequate. Deeren’s only basic act was to place orders for plaintiff with Luer. Of course, each order started in motion the necessary technical procedures, but importation of the automobiles ordered for plaintiff would not have been accomplished except for the credit arrangements which resulted in the direct payment by plaintiff through its bank of all costs incident to the purchase and importation of the pertinent automobiles.
 

 It is concluded that plaintiff was the inducing and efficient cause of the importation of the pertinent Volkswagens, that plaintiff was actually the first purchaser of such imported automobiles, and therefore the importer of the Volkswagens within the meaning of the pertinent excise statute. Plaintiff’s petition should be dismissed.
 

 FINDINGS oe Fact
 

 1. In early 1957, Charles Kirkiles, an accountant and partner in the New York firm of Kirkiles ‘and Kotiadis, was introduced to Menas Petrides. The introduction was made by George Stathos, who was then an officer and stockholder of Pelagic Company, Ltd. (Pelagic), a steamship agency and brokerage concern, with offices in New York City. At the
 
 *508
 
 time of the introduction to Petrides in Stathos’ office, Kir-kiles was engaged 'by Pelagic as its accountant, having received 10 percent of the company stock as an incentive to take on the work, and having located a branch office ad j acent to the suite occupied by Pelagic.
 

 2. Menas Petrides,
 
 [1]
 
 a Greek national, had arrived in New York in 1957, having worked in California since some time after World War II. Upon arrival in New York he was directed to Stathos who could offer him no employment but did offer him desk space free of charge in the offices of Pelagic. The arrangement appears to' have been that Pe-trides would concentrate his thoughts and efforts at setting up an import business, and if he were successful, Stathos would share in the profits. From the time of his arrival in New York, through 1958 and for part of 1959, Petrides held no regular employment. lie supported himself from limited savings which he had brought from California, loans from Stathos, fees for translating documents from time to time, and payments for doing odd jobs.
 

 3. From time to time in 1957 and 1958, Petrides and Kir-kiles discussed various business ventures, which for the most part dealt with the importation of goods from foreign countries (hardwood from Brazil; minerals from Bolivia; sewing machines from Japan; Volkswagen automobiles from Germany) . At the trial Kirkiles testified to the effect that new business enterprises were always of interest to him. He also testified that he knew Petrides was of limited financial means, and if Petrides intended to operate a business, he would need financial backing; but Kirkiles expressed confidence that financial assistance could probably be obtained by Petrides from outside connections on the basis of his demeanor and business-like manner, and the nature of the imported article.
 

 Petrides first mentioned to Kirkiles the subject of importation into this country of Volkswagen automobiles in the spring of 1958, and he told Kirkiles that Volkswagens were being shipped from Germany and sold here quite readily.
 
 *509
 
 Kirkiles at first expressed no great interest. He bad no clients in tbe automobile importation business. He did not like tbe paper work involved in the import business. He was generally familiar with import business in bis work of maintaining accounts for clients. As Petrides continued to pursue tbe subject, Kirkiles learned considerably more about the profit possibilities and formed a tentative conclusion that importing compact automobiles probably would be a good business.
 

 4. In late 1958 or early 1959, Pelagic suffered serious financial setbacks and ceased its operations. Stathos went abroad to seek new business, leaving Petrides without a place to conduct bis business affairs, as tbe Pelagic offices were closed. Petrides bad no office space for a period of time, nor did be have a telephone at bis apartment. Mail which heretofore had been received at Pelagic was delivered to Kirkiles’ office, and Petrides periodically stopped in at tbe latter’s office to pick up mail and messages left there for him. This arrangement was agreeable to Kirkiles, and tbe two men met and conversed during Petrides’ periodic visits, discussing from time to time importation of automobiles and other articles.
 

 5. In March 1959, Kirkiles went to Hamburg, Germany, on an accounting assignment. While be was there, be met a German attorney, Dr. Georg Constant, with whom be bad had previous correspondence by mail and telephone conversations. Constant told Kirkiles of bis intention to migrate to tbe United States, and be expressed bis desire to invest in a busmess there before bis arrival. Kirkiles suggested several possible business ventures, among which was tbe importation of Volkswagens for sale at retail. Constant indicated an interest in this proposition and suggested that they consult an acquaintance, Charles Feit, an American who was vacationing in Germany at tbe time. Feit, who bad operated an automobile agency in the United 'States, was well versed in both tbe wholesale and retail automobile businesses.
 

 6. The various aspects of importation and sale of Volks-wagens were discussed by the three men, Kirkiles, Constant, and Feit, in the days that followed. Feit advised that tbe purchase of the automobiles in Germany and importation into the United States would be more practical than obtain
 
 *510
 
 ing a franchise from an authorized Volkswagen distributor in America; that ¡Miami, Florida, would be preferable as a business location to New York City or some other large northern city where competition was keener; that entry of the cars directly into the port of Miami would eliminate the shipment south from Baltimore, the southernmost port where Volkswagens were being brought into the country at the time; and that such automobiles entering in Miami would be in a favored position ¡for sale in the south. He stated that his uncle was a bank official in a bank in Miami, and that such bank would make available the necessary credit for the operations.
 

 In regard to the purchase of automobiles in Germany, all three men recognized the need for someone available in Germany to supervise the purchase, 'as none of them was available or willing to undertake this portion of the total operation. Each man agreed to and did contribute a few hundred dollars toward the expenses of further exploration of the investment opportunity.
 

 7. After the completion of his accounting assignment in Hamburg, Kirkiles visited Stathos who was convalescing from an illness 'at a nearby resort area. Kirkiles was in the company of Constant and Feit during this weekend visit. In the course of their visit, Stathos was made aware of the proposed business of importation ‘and sale of Volkwagens.
 

 8. Kirkiles returned to New York City about the end of March 1959. Approximately 1 month after his return, he and Feit traveled together to Miami and met with Feit’s uncle, an officer of the Central Bank and Trust Company (Central) and other officers of the Miami bank. Numerous conferences were held in the period of April through August 1959 between the promoters and the bank officials to discuss the extent of financing Central would make available for the purchase of automobiles, the method of payment for the automobiles, the supplier of the automobiles, the finance charges for the line of credit, and the method of repayment to the bank. It was agreed that the promoters would deposit $50,000 with Central and that the bank would open a $250,000 credit account for the purchase of automobiles by the corporation when formed.
 

 
 *511
 
 When the necessary credit commitments had been obtained from Central, and it had been concluded that the business would be operated in Miami, a local law firm was employed to form the plaintiff, Import Wholesalers Corporation. Plaintiff was formally incorporated as a Florida corporation in August 1959. Kirkiles, Feit, and Constant each became officers and stockholders in plaintiff with office and proportion of stock therein as f ollows:
 

 Feit, president, 25 percent Kirkiles, vice president, 25 percent Constant, secretary-treasurer, 50 percent
 

 9. In the early summer of 1959,
 
 [2]
 
 a New York law firm, to which several referrals had been made by Kirkiles in connection with his accounting business, undertook to create, as a favor to Kirkiles and without the cost of legal fees, Deeren Trading Corporation.
 
 [3]
 
 No stock for this corporation was issued, there were no assets, and no incorporator was connected with it other than Kirkiles, his brother, and the members of the law firm.
 

 Some time thereafter, Kirkiles proposed to Petrides that he (Petrides) take over Deeren Trading Corporation (Deeren) for the cost of legal and filing fees. Kirkiles testified that Petrides had contacted him for a referral to a law firm which could form a corporation for Petrides as soon as possible, that Kirkiles suggested that Petrides pay legal and filing fees for Deeren, and upon these conditions Kirkiles would be agreeable to releasing Deeren to him, and Kirkiles would then retain his credit with the law firm for other future services.
 

 10. Some time in 1958, Petrides had become associated with Emerson Trading Corporation (Emerson), as an unpaid agent. Emerson had been formed and was solely owned by
 
 *512
 
 Stathos. Until June 1959, Emerson remained dormant, having no place of business, assets, or paid employees. At some time in 1959, Stathos referred Petrides to a German freight-forwarding concern, Hans R. Luer (Luer), which apparently was in a position to ship Volkswagens to the United States from Germany. At about the time that Kirkiles turned over Deeren to Petrides for incorporation by him, but before incorporation, Petrides used Emerson’s name as the importer of record in placing a New York dealer’s order with Luer, although the purpose of Emerson was not the importation of automobiles. There is some proof that the sale of this shipment of automobiles from Luer to the New York dealer was with the assistance of Kirkiles (whose firm was accountant for Emerson), and that in June 1959, Kirkiles aided Petrides in securing office space for Emerson.
 

 11. Although no date certain can be ascertained from the record, Deeren was formally incorporated as a New York corporation some time between June and August 1959. Petrides controlled the corporation, and he was its sole employee. Kirkiles’ firm was engaged as its accountant. The assests of Deeren were almost nothing, and it does not appear that any capital was paid in. Deeren was based for operation in the office space rented in the name of and paid for by Emerson.
 

 12. In August 1959, Kirkiles returned to Hamburg, Germany, where he met again with Constant. It was testified by Kirkiles that although Constant was in a position, geographically, to arrange for the shipments of automobiles to Miami for sale by plaintiff, he preferred not to, because of his professional duties as a lawyer, and also because of his plans to migrate to the United States. Kirkiles also testified that during this visit, Constant agreed to a suggestion by Kirkiles that Deeren purchase the automobiles for plaintiff.
 

 13. From an office for which the rent was paid by Emerson, Deeren, as seller, on August 19, 1959, entered into a written agreement with plaintiff, as purchaser, whereby plaintiff agreed to purchase from Deeren a minimum of 100 and a maximum of 300 used Volkswagen automobiles per month for the “competitive market price” plus $5 for each automobile. The “competitive market price” is defined to include
 
 *513
 
 the bank lien (invoice cost of the automobile), customs duty, freight charges, and customs brokers’ fees. The agreement, signed by Petrides for Deeren, and Feit for plaintiff, further provides that the $5 per automobile payment be made directly to Deeren at its New York office and that plaintiff pay all other costs and expenses “directly at the request of” Deeren.
 

 14. The automobiles ordered by Deeren from Luer for plaintiff were shipped to a port of entry in or nearby Miami. From the $250,000 account held by Central for plaintiff’s purchase of automobiles, Central forwarded to its correspondent New York bank, which was the assumed agent for Deeren, a letter of credit in an amount sufficient to cover the cost of the automobiles and expenses of shipment. The letter of credit was expressly made irrevocable and assignable, and for each order of automobiles it was assigned and returned to Central in Miami. The purpose of the assignment was to accomplish payment for the shipment of automobiles upon arrival at the port of entry at the direction of Deeren.
 

 In all cases, the exporter forwarded all documents of ownership for the Yolkswagens to the New York bank in the name of Deeren as importer and buyer. The indicia of ownership were not released to Deeren, however, but were forwarded to Central, which had banker’s liens on the automobiles. Upon arrival of the automobiles, Deeren through its New York bank, which forwarded the German titles to the Yolkswagens, directed Central to remit payment to a designated German bank for the automobiles and to the customs broker for 'his services in connection with clearance,. Payments were made by Central from the account derived from the assigned letter of credit, and title was simultaneously transferred to plaintiff. The physical possession of the title documents, however, remained with Central, which held trust receipts on the Yolkswagens against the original loan of $250,000. When the automobiles were sold at retail to plaintiff’s individual customers, title was transferred to the name of the customer and delivered to him or to his bank, if he chose to finance the purchase. From the individual sales by plaintiff, Central recouped its loan made to plaintiff for the purchase of the automobiles.
 

 
 *514
 
 All documents in evidence forming part of the process of importation in the United States, agreements to sell, bills of lading, customs invoices, seller’s (exporter’s) invoices, broker’s statements, designate Deeren either as the “importer of record,” or the “purchaser,” or the “party whose account is to be charged.” None of the same documents indicates that plaintiff assumed any risk in the importation of the vehicles into the United States. In any event the risk was minimal in view of the fact that marine insurance was carried on the shipments while in transit. Although it does not appear in whose name the insurance was carried (Kirkiles called it a “bearer policy” in his testimony), it is inferred from the facts attendant to the agreement between Deeren and plaintiff that the insurance cost was 'borne by plaintiff.
 

 15. Deeren imported some Yolkswagens and sold them to automobile dealers other than plaintiff. Kirkiles testified that the arrangements with other dealers differed from those with plaintiff in that Petrides was free to negotiate the price of the automobiles with others. He testified that the set $5 profit arrangement with plaintiff was agreed upon to provide Deeren with a steady income of known amount, that plaintiff anticipated the purchase of 200 automobiles per month, and that Deeren would then have a steady income of $1,000 per month for the payment of its overhead and a salary for Petrides, leaving Petrides free to negotiate other contracts with automobile dealers.
 

 16. Hans Luer was the only German supplier of automobiles with whom Deeren dealt. The record discloses no direct contact between Luer and plaintiff. However, Deeren in no instance placed an order with Luer without a prior commitment for purchase by plaintiff or some other dealer. There was no negotiation for price between Deeren and Luer. Petrides simply placed the American dealer’s order with Luer in Deeren’s name, and he was subsequently advised of shipment date. Petrides designated Deeren’s role in the transaction with Luer as purchaser “on a consignment basis.” Until the invoices from Luer were received by the New York bank and forwarded to Central, neither Deeren nor plaintiff knew the cost for the shipment. Plaintiff at that time added up all of the charges on the shipment,
 
 *515
 
 divided the total sum by the number of automobiles in the shipment, and thus determined whether or not the price per unit was satisfactory. If such price was within market price limitations, plaintiff then accepted and purchased the shipment.
 

 Petrides never went to Germany to procure the imported automobiles nor for any other purpose, and Deeren had no employees there. Dereen did not inventory or handle automobiles, and it did not advance funds or issue letters of credit in favor of the German exporter to facilitate any of the sales.
 

 17. As each shipment of automobiles arrived in or near Miami, clearance was arranged by a customs broker who was paid by Central at the “direction” of Deeren. The automobiles were then picked up by plaintiff’s employees and driven to its lot for sale at retail. Although Kirkiles denied that Feit had helped clear the automobiles through customs, Petrides said in answer to a written interrogatory directed at his contractual arrangement with plaintiff that Mr. Feit of Import Wholesalers helped him with customs red tape.
 

 18. After Central had paid the German bank designated by Luer for payment for the shipment, plaintiff then sent Deeren a check equal to $5 for each automobile received. Invoices purporting to be 'bills of sale from Deeren to plaintiff are in evidence and indicate the total cost for the shipment, less the price paid to the German bank for the automobiles and less other related costs such as customs duties, freight and customs brokers’ fees paid by Central at the direction of Deeren from plaintiff’s account, and showing the net balance due Deeren. This last item is in every case the $5 per automobile profit to Deeren. Only this ‘amount was actually paid to Deeren. The checks in payment were prepared by Kirkiles, who was accountant for both plaintiff and Deeren, and in some instances Kirkiles endorsed the checks for deposit to Deeren’s bank account.
 

 19. In October 1959, the question arose between Petrides and Kirkiles whether an excise tax was payable on the sale of the imported Volkswagen automobiles. Kirkiles testified that he sought an answer from the Internal Kevenue Service office in New York City, and that he related the answer made
 
 *516
 
 at this office to Petrides that no excise tax was due on the importation of used automobiles, as opposed to new ones.
 

 20. In January 1960, agents of the Internal Revenue Service inspected the books and records of Deeren and indicated to Petrides that an excise tax was imposed on the sale of used imported automobiles. At that time a shipment of Violkswagens ordered by plaintiff was in transit and, according to Kirkiles’ testimony “in order not to confuse or mix this new shipment with the already existing problem in Deeren, we decided to form another corporation and import this later shipment of cars under the new corporation, in order to give time to clarify the position in regard to the Excise Tax matter of Deeren Trading.” The new company was called Comet Trading Corporation (Comet). It had no assets, paid-in capital, or employees other than Petrides. It operated from the same office used by Emerson and Deeren. From this shipment, plaintiff only purchased part of the automobiles delivered because of financial difficulties at the time of arrival in Miami. The remainder of the automobiles from this shipment were sold by Petrides to other dealers.
 

 21. On or about January 27, 1960, defendant, acting-through the duly qualified and appointed District Director of Internal Revenue in Jacksonville, Florida, seized certain of plaintiff’s automobiles at its lot in Miami, Florida, after having made and issued a jeopardy assessment issued against plaintiff for manufacturers excise tax due on its sales of imported automobiles in the fourth quarter of 1959. The jeopardy assessment was in the total amount of $62,100. The value of the cars seized is allegedly $12,291.86.
 

 22. Shortly after the issuance of the jeopardy assessment against plaintiff and the seizure of its automobiles from its lot in Miami, Kirkiles prepared a Federal excise tax return for Deeren, scheduling thereon
 
 inter alia
 
 the sales purporting to have taken place between Deeren and plaintiff. Petrides signed the return and filed it under protest. According to an exhibit introduced by plaintiff, the return bears a filing date of March 4, I960.
 
 [4]
 

 23. After signing the return prepared for his signature by Kirkiles, Petrides left the United States for South America.
 
 *517
 
 He refused to divulge the source of the funds used to pay his passage, although he admitted that he had received no salary from Deeren; that Deeren had operated at a loss; that Deeren had at the time of his departure outstanding debts to customs brokers; and that upon his departure from the United States he himself was without funds.
 

 24. On February 10,1960, a claim was filed by plaintiff on Internal Kevenue Service Form 843. The form recites that the claim pertains to a jeopardy assessment in the amount of $62,100 for manufacturers excise taxes due for the period from October 1,1959 through December 31,1959. The claim form states that no payment for the tax had been made, that there was no amount to be refunded, but the amount to be abated was $62,100. Form 843 is and was the same form used for refund of taxes paid, for refund of amounts paid for revenue stamps, and for abatement of taxes assessed but not paid.
 

 Attached to the Form 843 and made a part thereof by reference are several documents referred to as “riders.” Among the attached riders are (1) a sworn statement by Charles Feit, president of plaintiff, Stating the same gromids for abatement of the tax as are urged by plaintiff for refund of tax in this case, and (2) a letter from plaintiff’s attorney, stating in pertinent part:
 

 I respectfully urge that in order to mitigate the damages that we have already been caused to suffer (which I must inform you that I shall hold your Department personally liable for) by what we have urged upon you is an unjust and illegal tax lien and Jeopardy Assessment, that you immediately release the lien and assessment and return to us our rightful property.
 

 Plaintiff’s president asserted in detail that Deeren, not plaintiff, was the importer of the automobiles; that plaintiff had purchased its automobiles from Deeren at a fair market price; that Deeren and plaintiff were separate legal entities; and that the excise taxes were illegally assessed against plaintiff to collect the tax obligations of Deeren.
 

 25. In April and May 1960, the Internal Kevenue Service sold plaintiff’s automobiles upon which liens had been secured by jeopardy assessment. Proceeds from this sale were in the
 
 *518
 
 alleged amount of $9,243.88, no part of which has been refunded or made available to plaintiff.
 

 26. By form letter dated April 20, 1961, the District Director of Internal Revenue disallowed in full the claim filed by plaintiff on February 10, 1960. The letter indicates that it is in reply to a “claim for refund” of manufacturers excise taxes in the amount of $62,100 for the period ending December 31, 1959. No further claim or amendment to the February 10,1960, claim was filed by plaintiff.
 

 27. Plaintiff filed its petition in this court on April 4,1963, to recover the sum of $12,291.86, with interest, for excise taxes alleged to have been erroneously assessed and collected by defendant from plaintiff on imported automobiles allegedly first purchased within the United States by Deeren but thereafter sold by Deeren to plaintiff.
 

 At the pretrial conference in this case, the parties agreed with the approval of the trial commissioner to limit the trial of this case to the issues of fact and law relating to the right of plaintiff to recover, reserving determination of the amount of recovery, if any, for further proceedings.
 

 Conclusion or Law
 

 Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover on its petition, and that plaintiff’s petition should be dismissed.
 

 *
 

 The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).
 

 [1]
 

 § 4061. Imposition of tax.
 

 (a)
 
 Automobiles.
 
 There is hereby imposed upon the following articles (including in each case parts or accessories therefor sold on or in connection therewith or with the sale thereof) sold by the manufacturer, producer, or importer a tax equivalent: to the specified percent of the price for which so sold:
 

 $ * * 0 *
 

 (2) Articles taxable at 10 percent except that on and after July 1, 1959, the rate shaU be 7 percent—
 

 Automobile chassis and bodies other than those taxable under paragraph (1).
 

 Chassis and bodies for trailers and semitrailers (other than house trailers) suitable for use in connection with passenger automobiles.
 

 A sale of an automobile, trailer or semitrailer shall, for the purposes of this paragraph, be considered to be a sale of the chassis and of the body.
 

 [2]
 

 § 7422.
 
 Omil actions for refund.
 

 (a)
 
 So suit prior to filing claim for refund.
 

 No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally
 
 *496
 
 assessed or collected, or of any penalty claimed to Rave been collected without authority, or of any sum alleged to have been excessive or In any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.
 

 [3]
 

 At the pretrial conference, the parties agreed that the trial of this case be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings. The agreement was approved by the trial commissioner.
 

 [4]
 

 This case was not cited by the parties, and no other case has been found, or cited by the parties, in which there has been a ruling that a claim for abatement was or was not under any circumstances sufficient to satisfy the requirements of the claim for refund statute.
 

 [1]
 

 Petrides, who now resides in Brazil, did not testify at the trial. However, after leave had been obtained upon application to the court, the parties utilized letters rogatory to elicit his testimony. The interrogatories were propounded and answer’s thereto were certified by the United States Consul at Belem, Para, Brazil. The documents bearing the seal of the Consul were received in evidence by the trial commissioner at the pretrial conference.
 

 [2]
 

 There is a dearth of exact dates in the record, the result of which leads to doubt as to whether Import Wholesalers Corporation or Deeren Trading Corporation came first. In view of the defendant’s contention that the latter corporation acted in a representative capacity in the transactions which are the subject of the tax in question, it is somewhat surprising that more determinative and exact proof was not addressed as to when the corporations came into being.
 

 [3]
 

 There is no satisfactory proof of the organizational purpose of this corporation, as might have been stated in articles of incorporation, or otherwise.
 

 [4]
 

 Petrides testified through interrogatories that he left the country in February 1960.