Whitaker, Judge,
delivered the opinion of the court:
This is a suit for refund of a Federal manufacturer’s excise tax imposed upon plaintiff as the manufacturer of certain phonograph records. The legal question presented for our determination is whether plaintiff was the statutory “manufacturer” of these records and liable for the tax imposed by section 3404(c)[1] of the Internal Revenue Code of 1939.
Prior to April 14, 1949, plaintiff was the actual manufacturer and wholesaler of children’s phonograph records. On that date, however, it entered into a series of agreements with Waterbury Companies, Inc. (hereinafter called Waterbury), which altered its business operations. Under this arrangement: Waterbury purchased all of plaintiff’s factory equipment and moved it to its own plant in Waterbury, Connecticut; plaintiff granted an exclusive and non-assignable license to Waterbury to manufacture records, using stampers made from the plaintiff’s original recordings, as well as recordings which the plaintiff would produce in the future, but plaintiff maintained ownership of these recordings; plaintiff furnished all the pictures or drawings which appeared on the records and on the accompanying sleeve packages.
*688 The records which were produced by Waterbury were to be sold either to the plaintiff, for resale by it, or by Waterbury itself, to fifteen, large department or “chain” stores, which were known as the syndicate stores. Waterbury guaranteed to produce a minimum number of records and it further guaranteed to sell to plaintiff at least one-third of all the records it produced. Originally the actual sale of the records to the retailers was to be carried out by independent distributing corporations, but by the tax year in question plaintiff acted as the distributor for both the records it sold to independent stores, as well as records sold by Waterbury to the syndicate stores.
The financial arrangement between Waterbury and plaintiff was quite complicated. In essence, however, it provided that plaintiff should receive a five per cent commission for all sales which it made to the syndicate stores as Waterbury’s distributing agent. The sales made by plaintiff to independent stores were made at a price fixed by plaintiff, and Waterbury reserved only the right to disapprove these sales for credit reasons. Because of the advances Waterbury made to finance plaintiff’s operations,[2] all payments for sales made to the independent stores were mailed directly to an escrow account controlled by Waterbury in a Waterbury, Connecticut, bank. Waterbury withdrew from the account the price' it charged plaintiff for the records, and then applied the remainder to reduce plaintiff’s indebtedness arising from the advance payments made by Waterbury.
In June 1953, at the direction of the Internal Revenue Bureau, plaintiff filed a manufacturer’s excise tax return showing the total tax for phonograph record sales for that, month in the amount of $3,377.04, against which was credited $3,198.80, which was the tax previously paid by Waterbury on its sales of these records to plaintiff. Plaintiff then paid *689 the resulting net tax of $178.24 under protest. This tax was based upon the difference in price received by plaintiff from its customers and the amount received by Waterbury from plaintiff. The tax levied against plaintiff is on only the sales made by it to the independent stores. It is the Government’s contention that with regard to these sales, plaintiff is the statutory manufacturer of the records.
In order to determine the issue we must look first at the manufacturing process involved. To manufacture these phonograph records approximately eight steps must be accomplished. (1) The drawings are prepared for stamping on the finished record. These drawings consisted of scenes depicting, for instance, some of the escapades of “Br’er Rabbitt”, or others designed to attract the eyes of children. (2) The song which is to be recorded is played and the sound waves are collected on a plastic record by means of a recording needle. (3) This plastic “master” is then prepared for electroplating. (4) The plastic material is then placed in an ■electroplating bath and covered with a coating of metal. This metal shell is then removed from the plastic and is called the metal master. (5) The metal master is then placed in an electroplating bath and a metal shell is formed thereon. This shell is then stripped off and represents a record which is in all respects the same as the original plastic or wax recording. This is called a “mother” record. (6) The mother is in turn placed in an electroplating bath and a thin shell deposited thereon which when stripped off is known as the working matrix or stamping matrix. (7) The stamper is reinforced with nickel. (8) The record is then stamped out by placing the plastic material in a press under great pressure. Before stamping, the scenes prepared by plaintiff are impressed on the plastic material.
Of these eight steps, plaintiff accomplished the first five, and Waterbury then completed the process by using the “mother” record produced by plaintiff. Thus, Waterbury’s price upon sale of the finished product to plaintiff was based only on the last four steps in the overall process of production, plus the sum of $5,000 per year, which it paid plaintiff for its share of the cost of the drawings impressed on the face of the records. On the other hand, the price charged by *690 plaintiff was of necessity based not only on the price charged it by Waterbury, but also its cost of carrying out the first five steps in the manufacturing process. It results that plaintiff’s sale to the independent stores was the first sale to reflect the entire cost of the eight-step manufacturing operation.
We are of opinion that Congress in levying the manufacturer’s excise tax intended that the tax should attach to the entire cost of the manufacturing process. Thus, the courts have consistently held that a person, who furnishes material to an independent contractor to manufacture a taxable item for him exclusively, is the manufacturer within the meaning of the revenue statute. Carbon Steel Co. v. Lewellyn, 251 U.S. 501; Warner-Patterson Co. v. United States, 68 C. Cls. 237. The applicable Treasury regulations[3] so provide. On at least one occasion it has been held that a patent owner-distributor, who in fact did none of the actual manufacturing or assembling of the taxable item, was the manufacturer. Polaroid Corp. v. United States, 235 F. 2d 276. The court in the latter case based its decision partly on the fact that the price to the patent owner did not include any amount for royalty, which, of course, is a part of the cost of manufacturing a patented article.
However, in our case the plaintiff did in fact carry out certain steps in the manufacturing process, and its sales price to the independent stores was based upon the entire cost of manufacture. Waterbury’s sale price to plaintiff was not. The tax was levied on the initial sales price which was based upon the entire cost of manufacture. This was plaintiff’s price to the independent stores, not Waterbury’s price to it.
It results, therefore, that plaintiff is not entitled to recover, and its petition will be dismissed.
It is so ordered.
*691 Maris, Circuit Judge (Ret.), sitting by designation; Laramore, Judge; Madden, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of the Trial Commissioner William E. Day, and the briefs and argument of counsel, makes finding of fact as follows:
L Plaintiff is, and at all times herein mentioned was, a corporation duly created and existing under the laws of the State of New York, having its principal office in the City and State of New York.
2. Waterbury Companies, Inc. (hereinafter called “Waterbury”) is, and at all times herein mentioned was, a corporation duly created and existing under the laws of the State of Connecticut, having its principal office and factory in the City of Waterbury, State of Connecticut.
3. On April 14, 1949 the plaintiff and Waterbury entered into an agreement which was to, and did, have a great deal to do with altering the business of both firms concerning the manufacture and sale of phonograph records.
4. This suit was brought to recover the amount of manufacturers’ excise tax on sales of phonograph records in June 1953 which the plaintiff paid under protest.
5. Before April 14,1949 the plaintiff manufactured in its own plant in Brooklyn, New York, and sold children’s phonograph records, and reported and paid manufacturers’ excise tax on its sales of such records. It utilized machinery and equipment owned by it in such manufacture. About 30 or 35 people were employed in its factory.
6. Before the date mentioned above, Waterbury, a much larger firm, was engaged in the business of moulding of plastics and metal fabrication. It had engaged in a limited degree in the making of phonograph records.
7. On April 14,1949 the plaintiff and Waterbury entered into an agreement by which Waterbury purchased all the plaintiff’s factory equipment then located in Brooklyn, New York for removal to its plant at Waterbury. The plaintiff granted an exclusive and non-assignable license to manufacture phonograph records using stampers made from the plaintiff’s original records or mothers and masters then *692 owned, as well as thereafter produced by the plaintiff, with Waterbury to pay the cost of all stampers and upon expiration or termination of the agreement all stampers were to be destroyed by Waterbury. The plaintiff agreed to make available to Waterbury its then available recordings so that Waterbury could have stampers made to enable it to go into production of phonograph records.
The plaintiff agreed to produce new recordings at its cost for eight recordings per year and at Waterbury’s cost if more than eight were required. Waterbury was to manufacture 6% inch children’s records, using the stampers as follows:
1. Unbreakable, cardboard, plastic-covered picture records.
2. Clear and transparent vinylite picture records containing a two-sided picture inserted so as to be visible from each side of the record.
3. Translucent vinylite records, in standard colors as selected by Guild from time to time, with labels affixed to both sides.
All of such aforesaid records shall be “two-sided”.
By the terms of the agreement, Waterbury guaranteed to produce stated quantities of records and to sell them only to the plaintiff except that Waterbury was to arrange for sales of records to syndicate stores as follows:
W. T. Grant Co.
H. L. Green Company, Inc.
H. D. Kittinger Co.
S. S. Kresge Company
S. H. Kress & Co.
M. H. Lamston Co., Inc.
McCrory Stores Corporation
McLelland Stores Company
G. C. Murphy
Company
Neisner Brothers, Inc.
J. J. Newberry Co.
Scott-Burr Stores Corporation
F. W. Woolworth Co.
Montgomery Ward and Sears Roebuck except for mail order
The agreement further provided that all art work pictures, labels, printing and lithographing should be subject to the approval of the plaintiff. All records produced were to bear language identifying the records to be a product of the *693 plaintiff. The cost of the art work, labels, envelopes and plates up to $15,000 during the first year of operations and $5,000 per year thereafter was to be borne by Waterbury.
8. The plaintiff’s factory equipment was removed from the plaintiff’s factory and transported to Waterbury’s plant and set up there for production of the final step in the making of phonograph records, the stamping of the records.
9. A phonograph record is made in the following manner:
(1) The song which is to be recorded is played and the soundwaves collected in a plastic record by means of a recording needle.
(2) This plastic “master” is then prepared for electroplating.
(3) The plastic record is then placed in an electroplating bath and covered with a coating of metal. This metal shell is then removed from the plastic and is called the metal master.
(4) The metal master is then placed in an electroplating bath and a metal shell is formed thereon. This shell is then stripped off and represents a record which is in all respects the same as the original plastic or was recording. This is called a mother record.
(5) The mother is in turn placed in an electroplating bath and a thin shell deposited thereon which when stripped off is known as the working matrix or stamping matrix, or the stamper.
(6) The stamper is reinforced with nickel.
(7) The stamper is placed in a press and applied to plastic material under great pressure and the record is stamped out.
10. When arrangements for the sales of records to syndicate and independent stores had been worked out, a so-called four way agreement was entered into between the plaintiff, Waterbury, The Meyercord Co. and BeVier Consultants, Inc. on June 20,1949 by which the latter two firms were to handle the sales to syndicate and independent stores of records produced under the contract referred to in finding 7 as amended on June 24,1949.
11. By the end of November 1950 The Meyercord Co. apparently had determined to discontinue the handling of records under the contract and was terminated as to that com *694 pany by Waterbury and the plaintiff. Be Vier consultants apparently withdrew from further participation at about the same time.
12. Thereafter Record Guild Distributing Corp., a company having the same officers, directors and stockholders as the plaintiff, entered into an agreement with the plaintiff company and Waterbury on December 20, 1950 by which Waterbury appointed Record Guild Distributing Corp. and that firm accepted the appointment as the sole and exclusive distributor of Guild records to syndicate stores. That agreement provides in part as follows:

D

As to Finance and Credit for Non-Syndicate Store Sales

D-l. Notwithstanding any of the terms of said Two Way Contract, all orders solicited after the effective date hereof, during the term of said Two Way Contract, shall be subject to the terms of Part D hereof, and unless otherwise provided by agreement of the parties hereto, will be solicited by Distributor, and all such orders will be governed by the provisions of this agreement and all such orders will be submitted to Waterbury, and Waterbury agrees that within three business days, from the receipt of such order, it will decide what action it will take in reference thereto; reject those not acceptable for credit reasons and will so notify Distributor; and such orders as it will accept only on a cash in advancej or c. o. d. basis, will be accepted only after its action in reference thereto shall be cleared, in writing, with Distributor; and all other orders shall be deemed to have been accepted on an open account basis.
D-2. Waterbury will accept no order unless Distributor furnishes such order on acceptable forms and hi addition furnishes packing slips, required copies of the invoices properly completed to show shipping instructions, routings, quantities, prices, and all other papers necessary for completing the shipment. Such orders will be filled by a shipment direct to the customer by Waterbury, and such customer will be billed by Waterbury, making use of .Distributor envelopes and Distributor billheads so devised as to indicate that Distributor’s office is at 835 South Main Street in Waterbury with P. O. Box 1032, and indicating that the payment for such invoices shall be made to Distributor at such Waterbury address.
*695 In the event that, notwithstanding the use of such envelopes and billheads, payment is actually made by a customer to Guild or Distributor, it is agreed that such payment will be forthwith forwarded to Waterbury. In no event shall Guild or Distributor accept payment in cash, or cash any check, draft, money order or negotiable instrument received in payment for such records.
D-3. It is agreed that Guild and Distributor have each opened an account at the Waterbury National Bank and have provided suitable signature cards, and it is agreed that such accounts shall be continued and remain open during the term of this agreement, and that the persons who will be authorized to make deposits and withdrawals in such account on behalf of Guild or Distributor shall be Arnold E. Swanson and Barbara C. Craft, and that resolutions and signature cards to be provided shall so indicate, and that Waterbury is hereby given the right to substitute the signatories for the bank account at the Waterbury National Bank in two (2) other persons.
D-4. It is agreed that Waterbury, through said Arnold E. Swanson or said Barbara C. Craft, will deposit forthwith all payments received from any such customers, and it is agreed that said Arnold E. Swanson or said Barbara C. Craft will forthwith draw a check on said account for the amount due to _ Waterbury under the terms herein set forth, and remit in accordance with the terms hereof to Guild and Distributor, as the case may be, and it is agreed that Waterbury will cause a complete statement of the account for each calendar month to be prepared and forwarded to both Guild and Distributor on or before the twenty-fifth day of the month next succeeding.
D-5. The terms of payment for any orders shipped on an open account shall be 1% 10 days 30 days net, or cash in advance, or c. o. d. as the case may be, and the terms of payment shall appear on the bill sent to the customer with the order, and in each instance a duplicate of the bill shall be thereupon forwarded by Waterbury to Distributor. It is agreed that the risk of non-collection of any such accounts shall be and remain with Waterbury Companies,[4] but in the event that in order to effect a collection, Waterbury Companies is obligated and does, in fact, incur any expense for collection fees of its credit insurer, Guild and Distributor shall be *696 obliged to reimburse Waterbury to the extent of such collection fees, and said Arnold E. Swanson or said Barbara C. Craft is authorized to reimburse Waterbury for such collection fees from any balance remaining in-the account for such fees as shall have been disbursed;
D-6. Waterbury guarantees to Guild and Distributor jointly and severally that said Arnold E. Swanson, said Barbara C. Craft and their successors will perform the duties for which provision is herein made in accordance with the terms hereof and not otherwise.
D-7. Notwithstanding the provisions of Paragraph-B-l hereof as to non-syndicate store sales as to the termination of this agreement, the terms of Paragraphs-D-l through D-8 hereof, shall continue in full force- and effect and such termination will in no way prevent the enforcement of the provisions of said paragraph® to non-syndicate store sales.
D-8. The provisions of the letter of instruction to Arnold E. Swanson, Barbara C. Craft and Waterbury,. dated March 1, 1950, shall cease to be operative on the effective date hereof, and thereafter the amount to be paid and the parties to whom payment shall be made,, shall be governed by the terms of this agreement.

E

As to Finance and Credit for Syndicate Store Sales

E-l. Paragraphs D-l, D-8, D-4 and D-6 of Part D1 of this agreement shall be applicable.
The terms of payment for any orders shipped shall be 1% 10 days 30 days net delivered store, and the terms-of payment shall appear on the bill sent to the customers, and in each instance a duplicate of the bill shall be thereupon forwarded by Waterbury to Distributor.
E-2. Waterbury agrees that it will accept orders,, ship, pack and invoice the same promptly at its own-cost and expense.
E-3. Waterbury agrees to purchase record players and sell the same at its own cost (plus cost of recasing and other actual out of pocket expenses incurred) to syndicate stores desiring the same to the extent that they shall be required for promotional work in syndicate stores, Waterbury further agrees, at its own cost and expense, to furnish Distributor with all necessary advertising displays and sales aids, provided however that Waterbury shall not be required to expend more than two thousand ($2,000.) dollars for same during the term of this agreement.

*697
F

As to Syndicate Store Sales

F-l. It is agreed that syndicate store sales, during the term of this agreement, shall be made by Distributor and that the provisions of Part C of said Two Way Contract^ except to the extent that such provisions may be modified or varied by the provisions of this agreement, will be applicable to such sales and to Distributor as the representative of Waterbury, designated pursuant to Paragraph C-24 of said Two Way Contract.
F-2. All syndicate store listings, during the term of this agreement, shall be in the name of Distributor, and not otherwise.
F-8. The provisions of Paragraphs C-26, C-27, C-28, C-29 and C-30, of said Two Way Contract are hereby suspended for the period during which this agreement remains in full force and effect.
F-4. Distributor agrees to use its best efforts to make_ syndicate store sales and in the event that the combined orders for records for both syndicate and non-syndicate sales exceed Waterbury’s productive capacity, orders for non-syndicate store sales will be filled only in a monthly amount equivalent to one-third of Waterbury’s monthly production. Waterbury’s productive capacity shall be that capacity that can be established through normal manufacturing procedures from existing equipment in Department 59.

a

Guarantees and Payments by Waterbury

G-l. Waterbury does hereby agree to advance to Guild against Guild’s royalties, earnings and profits under said Two Way Contract for the period of this agreement the sum of sixty thousand ($60,000.) dollars, which said sum shall be paid to Guild in installments of twenty-five hundred ($2500.) dollars on the tenth and twenty-fifth days of each month during the term of this agreement.
G-2. Waterbury shall pay to Distributor on the twenty-fifth day of each month during the term of this agreement, a commission of five (5%) per cent on all syndicate store sales made during the calendar month next preceding the month of payment, and such five (5%) per cent shall be computed upon the net billing to the syndicate store.
*698 G-3. Waterbury is hereby authorized to instruct said Arnold E. Swanson and Barbara C. Craft and their-successors to deduct from all monies from both syndicate and non-syndicate store sale and remit the following items in the following order:
(1) Waterbury’s price, as calculated in accordance with the provisions of Paragraph B-ll of the* said Two Way Contract, as such price provisions are hereinafter modified:
(2) The sum theretofore paid to Guild under G-l hereof;
(3) So long as Guild and Distributor or either of them, is indebted to Waterbury, for other than Special Account (Eeference Two Way Contract Paragraph B 11 (h) Item (8), fifty (50%) percent of any monies remaining in any month shall be paid to Waterbury to be applied in reduction of such indebtedness; the remaining fifty (50%) percent shall be paid to Guild and/or Distributor on the twenty-fifth day of each month, but in no event, while either Guild or Distributor is so indebted to* Waterbury, shall the payment to them or either of' them under this section exceed Five thousand ($5,000.) dollars per month until Waterbury shall nave been fully repaid.
If the sum so disbursed to Waterbury shall extinguish the debt of either Guild or Distributor or both to Waterbury, thereafter one half of the monies so paid to Waterbury shall be retained by it up to Twenty thousand ($20,000) dollars maximum to provide Waterbury with funds to make* such payments as may thereafter become due from-Waterbury by reason of the provision of G-l hereof, and all funds so retained and unused for said purpose shall be repaid to Guild or Distributor as the* case may be when payments to Guild under G-l shall no longer he due.
G-4. Nothing herein shall be deemed to forgive any indebtedness of Guild and Distributor, or either of them, to Waterbury, whether such indebtedness shall now exist or shall be hereinafter incurred, including any advances made by Waterbury under G-l hereof which have not been repaid at the termination of this agreement.
13. The agreements hereinbefore described were further supplemented by agreements between the plaintiff and Waterbury dated December 27, 1951 and October 1, 1952. *699 It appears that at about December 1951 the separate identity between plaintiff and Record Guild Distributing Corp. was dissolved as far as the relationship between the plaintiff and Waterbury was concerned. Both the plaintiff and Waterbury considered the plaintiff and Record Guild Distributing Corp. as one company. This was testified to by officers of the three companies.
14. Acting under the agreements then in effect in 1953, Waterbury financed practically the entire operation in connection with production of the phonograph records. The plaintiff performed the steps necessary to obtain the musical arrangements, the original record, and the preparation of masters from which the stampers were made. Practically all of these steps took place away from plaintiff’s office and away from Waterbury’s factory. The plaintiff accomplished the following steps:
1. It selected the material to be recorded.
2. It selected the artists.
3. It selected the arrangement.
4. It provided the place for the recording to be accomplished usually in a recording studio owned by others.
5. It arranged for the making of the mothers and masters from the original recording.
6. It provided art work for record labels, picture or other insert discs, sleeves and albums.
7. It secured copyrights in the name of plaintiff on most of the art work.
15. Waterbury at its factory produced the finished phonograph records using stampers obtained by plaintiff but paid for by Waterbury. It purchased the raw material and stocked the records until sold.
16. The plaintiff performed the sales work on the records produced by Waterbury. It would send the orders it received to that firm. If Waterbury was satisfied as to the credit of the purchaser it would, using a combination factory order and invoice form (with plaintiff’s name and Waterbury’s address imprinted thereon), type up the order and fill it by shipping the records direct to customers of plaintiff. Waterbury would then mail to the customer an invoice with the plaintiff’s name imprinted on it calling for payment of such invoice at Waterbury’s address. Water *700 bury would then send its invoice to the plaintiff. The plaintiff had opened an account at the Waterbury National Bank in Waterbury, Connecticut. It had authorized Arnold Swanson and Barbara Craft to make deposits to and withdrawals from such account. Both individuals were officers of Waterbury. Upon receipt of payments usually by check to plaintiff, mailed to Waterbury’s address, either Mr. Swanson or Miss Craft would deposit such checks to the plaintiff’s bank account and disburse the proceeds thereof in accordance with the agreements. Other deposits to the bank account, also called the escrow account, were made by Waterbury to cover plaintiff’s salesmen’s commissions. Checks on plaintiff’s bank account were drawn by Mr. Swanson or Miss Craft to pay Waterbury its selling price of the record. This would be payment of Waterbury’s invoice to plaintiff. Payment of plaintiff’s salesmen’s commissions was made by checks drawn by Swanson or Craft. Because of advancements of monies by Waterbury to plaintiff, the latter was always indebted to Waterbury. Any funds remaining in the escrow account after payments made as described above were accomplished, were paid over to Waterbury to reduce such indebtedness.
17. The risk of non-collection for records sold by the plaintiff was with the plaintiff. The plaintiff agreed to insure the collection of such accounts in a company satisfactory to Waterbury. This change resulted from a memorandum of agreement of October 1,1952 between plaintiff and Waterbury.
18. Waterbury, on December 27, 1951, discharged Guild and Record Guild Distributing Company of an indebtedness of $73,559.69 and agreed to furnish Guild an additional $18,567.28 as payment to Guild for any breaches of contract by it for failing to make the required sales of “Guild Records” and further to secure for Waterbury a release of its obligation to make sales under the contract of June 24,1949.
19. During the course of the agreement Waterbury filed manufacturers’ excise returns and paid the taxes on the sales prices charged within the framework of the agreement.
20. The price at which the plaintiff sold the records was 5 percent more than the price which Waterbury received from such sales.
*701 21. For the month of June 1953, the plaintiff filed a manufacturers’ excise tax return showing total tax on phonograph records sold for the month in the amount of $3,377.04 against which was credited $3,198.80 with the following explanation:
The amount of the credit taken represents the amount of excise tax paid on the phonograph records involved by Waterbury Companies, Inc., Waterbury, Connecticut, from whom Record Guild of America, Inc. purchased said records.
A net tax of $178.24 was shown on the return.
22. On July 29,1953, Record Guild paid the sum of $178.24 under protest and it has been stipulated that no part of the tax was passed on to the vendee or vendees of the records.
23. A claim for refund of the manufacturers’ excise taxes in the amount of $178.24 was filed on August 28, 1953, and on December 28,1953, the Commissioner of Internal Revenue disallowed the claim for refund.
24. The assessment in the month of June 1953 was self assessed and was based upon the difference in price received by plaintiff from its customers and the amount received by Waterbury from plaintiff.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.

 Section 3404(c) of Title 26 U.S.C. (1952 eá.) reads:
“Sec. 3404. Tax on Radio Receiving Sets, Television Receiving Sets, Phonographs, Phonograph Records, and Musical Instruments.
“There shall be imposed upon the following articles (including in each case, except in the case of musical instruments, parts or accessories therefor sold on or in connection with the sale thereof) sold by the manufacturer, producer, or importer a tax equivalent to 10 per centum of the price for which sold: *****
(c) phonograph records.’

 Although we think it immaterial to the disposition of this case, it is true, as plaintiff says, that Waterbury advanced money to plaintiff to pay for the art work, to pay commissions to plaintiff’s salesmen, for advances to cover plaintiff’s commissions and profit, and for other purposes. Plaintiff was always in debt to Waterbury. In October 1952 it owed Waterbury a considerable sum, and the debt continued to grow. However, by these advances of money, Waterbury clearly did not make plaintiff its agent, except for the sales to syndicate stores, which are not involved in this action. It exercised no control whatever over plaintiff’s other activities.

 Treasury Regulations 46, § 316.4 reads In part:
“Sec. 316.4 Who is a manufacturer. — * * *
“under certain circumstances, as where a person manufactures or producea a taxable article for a person who furnishes materials and retains title thereto, the person for whom the taxable article is manufactured or produced, and not the person who actually manufactures or produces it, will be considered the manufacturer.”

 This was changes by a later amendment to place such risk with plaintiff. See finding 17.