Per Curiam :
This case comes before the court on plaintiff’s exceptions to a recommended decision filed September 22, 1972, by former Trial Commissioner James F. Davis pursuant to Rule 134(h). The court has considered the case on the briefs and oral arguments of counsel. Since the court agrees *386 with the decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and plaintiff’s petition is dismissed.
OPINION OF COMMISSIONER
Davis, Oommissioner:
This suit arises under § 4121 of the Internal Revenue Code of 1954 which imposes an excise tax of 5 percent on, among other things, household-type electrical juicers sold by the manufacturer, producer or importer. Plaintiff seeks refund of excise taxes it paid for the period July 1, 1960 through September 30, 1963. There are two issues: (a) whether (as defendant contends) plaintiff was the “manufacturer” of the juicers, within the meaning of the Code, or whether (as plaintiff contends) Moline Manufacturing Company, which fabricated the juicers for plaintiff, was the “manufacturer”; and '(b) if plaintiff was the “manufacturer,” whether the price base upon which the excise tax is to be computed for sales by plaintiff to its related distributor, Eastern Acme Juicer Manufacturing 'Company, should be '(as plaintiff contends) the price for w'hich juicers were 'actually sold to Eastern Acme, or rather ('as defendant contends) a constructive price equal to the lowest price at w'hich plaintiff sold juicers to unrelated wholesale distributors, pursuant to § 4216 of the 1954 Code.
Eor reasons noted in detail in the accompanying findings of fact and ultimate findings and conclusions, I hold (a) that plaintiff, rather than Moline, was the “manufacturer” and (b) that for sales to Eastern Acme, plaintiff must calculate the excise tax on the basis of a constructive sales price, equal to the lowest price for which it sold juicers to unrelated wholesale distributors.
Accordingly, plaintiff’s petition must be dismissed.
findings of fact
1. Plaintiff, Acme Juicer Manufacturing Company (“Acme”), is a California corporation with its principal office at Sierra Madre, California. Acme was originally a partnership consisting of Mr. and Mrs. Robert D. Dodge *387 and 'bis daughter and son-in-law, Mr. and Mrs. Ferguson. In November 1959, tbe partnership was incorporated.
2.(a) On June 26, 1964, Acme was assessed $140,002.70 of excise tax and interest for the period July 1,1960, through September 30, 1963. Acme made the following payments toward the assessment:

Date of Payment Amount

August 14, 1964-$7, 341. 52
August 21, 1964- 6, 435. 67
August 31, 1964- 87, 819. 04
October 23,11968_ 45, 636. 23
(b)' On August 31, 1964, $87,819.04 of excise tax paid by Moline Manufacturing Company was credited against Acme’s assessment.
3.Acme filed the following claims for refund :

Daté*Filed Quarter Amount

8/14/64. 3rd 1960, $7, 341. 52
1/14/69. 4th 1960. 2, 822. 31
1/14/69. lst 1961. 4, 456. 04
1/14/69. 2nd 1961. 3, 962. 73
1/14/69. 3rd 1961. 4, 960. 66
1/14/69. 4th 1961. 3, 820. 13
1/14/69. 1st 1962. 3, 340. 66
2nd 1962. 572. 21
1/14/69. 3rd 1962. 2, 999. 67
4th 1962. 38
1st 1963. 085. 59
1/14/69. 2nd 1963 3, 336. 77
1/14/69, 3rd 1963. 4, 201. 59
4. A notice of disallowance of the claim filed August 14, 1964, was sent to Acme by certified mail on February 21,1967. Notices of disallowance of the claims filed January 14,1969, were sent to Acme by certified mail on April 2,1969.
5. The Acme juicer is a household-type electric juicer which extracts juices from fruits and vegetables. During the years in issue, the juicer w,as made in three models, designated 5001, 6001 and 7001. All models were subject to manufacturer’s excise tax of 5% of the price for which sold, pursuant to •§ 4121 of the 1954 Internal Eevenue Code.
6. (a) Prior to 1950, Robert D. Dodge, through his partnership, purchased juicers which were manufactured by the Stowman Company and resold them under the name “Acme.” *388 Sometime in the early 1950’s, Dodge ceased buying juicers from Stowman because Dodge considered the product unsatisfactory. Stowman bad manufactured tbe juicers pursuant to a patent to one Draokenberg to wbom Stowman paid royalties.
(b) In tbe early 1950’s, Dodge (doing business under the Acme name) approached Instrument Development Manufacturing Corporation (“Instrument”), an established engineering and manufacturing firm, to design and develop a marketable vegetable juicer. By 1958, Instrument had developed and was making a juicer which it sold to Acme. Instrument purchased the raw materials and component parts necessary to make the juicer, as well as the necessary tools, dies and molds. At times, Dodge made loans to Instrument. In November 1957, Instrument ceased supplying Acme with juicers, due to severe financial problems which ultimately resulted in its bankruptcy.
7. In December 1957, Acme arranged with Douglas Moline, the production supervisor for the juicer at Instrument, to fabricate the “Acme Juicerator,” an electric household-type juicer. Douglas Moline organized Moline Manufacturing Company in Monrovia, California (“Moline”), for such purpose. Moline was set up and financed with the aid of Mr. Ferguson, one of Acme’s partners. Douglas Moline operated Moline originally as a sole proprietorship and later incorporated Moline with himself as the sole stockholder. Moline employed 10 men and made only one product, juicers for Acme. Moline had no sales organization.
8. In December 1957, Acme obtained the tooling, dies, molds, and shop drawings from Instrument’s plant by purchase or by foreclosing on its liens. Acme then transferred them to Moline. Moline, under the supervision of Douglas Moline, fabricated the juicer for Acme according to the shop drawings and specifications, and in accordance with know-how acquired by Douglas Moline in his earlier work for Instrument. Between December 1957 and December 1959, Moline fabricated juicers for Acme under a written agreement, noted in clause 1(a) of the agreement of December 3,1959. (Finding 9.)
*389 9. On December 3, 1959, Acme and Moline entered into the following contract:
1. This agreement is made in light of these facts and circumstances:
(a) Since on or before December 18,1957, the individuals who are the predecessors of the corporate parties herein have operated under an agreement whereby Moline has rendered certain manufacturing services to Acme and has been the sole and exclusive source for the production and assembly of the Acme Supreme Vegetable Juicer and Acme has obtained all of its requirements for said juicers from Moline.
(b) It is the mutual desire of the parties to continue such exclusive agreement between the corporate successors of such individuals and to further clarify and define the duties and obligations of the parties.
2. Acme agrees to purchase all of its requirements for the Acme 'Supreme Vegetable Juicer and all modifications or improvements thereof and for any other vegetable juicer to be manufactured, sold or distributed by Acme (all of which juicers are hereinafter referred to as “said juicers”) exclusively through and from Moline during the term of this contract; provided, however, that said juicers produced by Moline are manufactured and assembled in the good and workmanlike manner as heretofore manufactured and assembled by Moline and 'accepted by Acme.
3. Moline agrees to perform the necessary manufacturing services for the manufacture of all of said juicers required by Acme and to deliver said juicers to Acme f.o.'b., Sierra Madre, California; subject only to a production rate and delivery schedule as heretofore established by the parties and as such rate and schedule can be increased by Moline after reasonable notice from Acme.
4. Moline agrees to perform all manufacturing services for Acme in the production of said juicers, including but not limited to purchasing on the account of and as agent for Acme, all component parts and outside process work on such parts and the inspection and assembly of such component parts as presently performed by Moline.
5. Acme hereby constitutes Moline its authorized agent for the purchase of component parts, supplies and materials and outside process work required in the produc *390 tion, manufacture and assembly of said juicers by Moline.
Moline shall purchase such parts, supplies, materials and outside process work in such quantities and at such times as in its judgment is necessary to meet the production rate and delivery schedule as established by the parties.
Acme shall pay for all such parts, supplies, materials and outside process work upon the receipt of invoices for such items from the vendors thereof.
6. Acme shall .furnish at its sole expense all major tooling required for the manufacture of said juicers and all of its component parts, including but not limited to die cast dies, plastic bowl and cover molds, strainer basket stamping dies, drilling and tapping machine used on the base housing and staking dies for the cutter assembly.
Acme agrees to rework or replace such tooling when such tooling no longer produces an acceptable part within the plans and specifications for such part.
7. Acme shall pay to Moline the aggregate of the following sums:
(a) The sum of $10.94 for each said juicer manufactured, assembled and delivered.
Such sum shall be adjusted from time to time upon the demand of either party when the average hourly wage paid by Moline to its employees directly engaged in the assembly, manuf acture, and delivery of such juicers shall vary 5% or more from the existing wage average of $1.75 per hour for such employees. The amount of any adjustment shall be computed by applying the percentage of such variation to the whole amount paid under this subparagraph.
Such sum shall also be adjusted to reflect and compensate Moline for any increase in costs of direct and indirect labor resulting from any change of design or in the operations or processes performed by Moline in the manufacture and assembly of said juicers. Any such increase shall be based upon the actual increase in costs of direct and indirect labor necessary to perform such work.
To the extent necessary for such purpose, Moline will make its books and records available for the inspection of Acme or its authorized agent or representative.
*391 (b) An amount equal to any and all Federal or State excise tax or other tax imposed upon the manufacture, assembly, sale or delivery of said juicers by Moline.
Acme shall pay the aforesaid amounts to Moline upon the presentation of proper invoices after delivery.
8. The term of this agreement shall be for ten years commencing January 1,1960, and ending December 31, 1969, and shall continue thereafter unless and until terminated upon six months’ notice in writing by Moline to Acme, unless sooner terminated as hereinbelow provided.
If either party shall: (a) become insolvent, (b) make an assignment for benefit of creditors, (c) have a receiver appointed, (d) be adjudicated bankrupt, or (e) take or suffer any action under any insolvency or bankruptcy act, then and in that event only this agreement may be terminated by the other party upon ten days’ notice in writing.
9. This agreement shall extend to, inure to the benefit of, and bind the successors and assigns of each of the parties.
10.On July 16, 1960, Acme and Moline amended the agreement dated December 3,1959, as follows:
1. This amendment to an agreement is made in light of these facts and circumstances:
(a) The parties hereto entered into an Agreement dated December 3, 1959, relating to the manufacture and assembly of Acme Supreme Vegetable Juicers.
(b) It is the mutual desire of the parties to modify said Agreement of December 3,1959, in the following particulars only.
8. 'Paragraph 3 of said Agreement of December 3, 1959, shall be modified to read as follows:
“3. Moline agrees to perform the necessary manufacturing services for the manufacture and packaging of 'all of said juicers required by Acme and to deliver said juicers to Acme f.o.b., Sierra Madre, California; subject only to a production rate and delivery schedule 'as heretofore established by the parties and as such rate and schedule can be in *392 creased by Moline after reasonable notice from Acme.”
'3. The first clause of paragraph 8 of said Agreement of December 3,1059, shall be amended to read as follows:
“8. The terms of this agreement shall be for fifteen (15) years commencing January 1,1960, and ending December 31,1974, and shall continue thereafter unless and until terminated upon six ( 6) months’notice in writing by either party, unless sooner terminated as hereinafter provided.”
4. A new paragraph shall be added to the aforesaid Agreement of December 3,1959, as follows :
“10. All improvements and developments in the design or manufacture of the said juicer conceived or made by Moline shall be the sole property of Acme, and Moline shall, without expense to it, assist and cooperate with Acme in obtaining a patent or patents thereon.”
5. A new paragraph Shall be added to the aforesaid Agreement of December 3,1959, as follows:
“lh Moline will not, directly or indirectly engage in the production or assembly of any other juicer or parts, supplies, materials or outside process work relating to any other juicer so long as Acme shall continue to accept deliveries of not less than 1,300 units of said juicer over a three (3) consecutive month period.”
6. A new paragraph shall be added to the aforesaid Agreement of December 3,1959, as follows:
_ “12. Acme shall have the right at reasonable times during business hours, and so as not to interfere with manufacture and production by Moline, to inspect materials, work in process and inventory in the possession of Moline.”
7. A new paragraph shall be added to the aforesaid Agreement of December 3,1959, as follows:
“13. If, during the term of this agreement, Moline shall fail to manufacture or assemble said juicers under the terms, conditions and provisions of the ■within agreement and within the good and workmanlike standards herein set forth, except by reason of an act of God, strikes, war or other matter beyond the control of Moline, such failure shall be *393 deemed a default on the part of Moline. In the event such default is not corrected and cured within thirty (30) days after the receipt of written notice of such default from Acme, Acme shall have the right to terminate this agreement. Any such notice of default shall contain the nature, character and extent of the alleged default and shall be forwarded by certified or registered mail, return receipt requested, or personally delivered to Moline at:
1091 East Hamilton Eoad
Duarte, California.”
8. A new paragraph shall be added to the aforesaid Agreement of December 3,1959, as follows:
“14. This agreement and the amendment thereto shall be binding upon Acme and any wholly owned or subsidiary corporation 'by Acme, and any other corporation or entity created for the sale and distribution of said juicers.”
9. Except as otherwise herein modified or amended, the aforesaid Agreement of December 3, 1959, is reaffirmed and shall remain unchanged.
11. The agreement of December 3,1959 (with amendments of July 16, 1960), was carried out by the parties in accordance with its terms. Pursuant thereto, Moline made juicers exclusively for Acme and according to Acme’s needs. The number of juicers produced was dependent upon Acme’s inventory and sales. Moline performed as follows:
(a) Moline fabricated the juicers by (1) machining rough foundry pieces to closer tolerances, (2) adapting the motor pieces to the housing and shaft which drives the flywheel, (3) machining some of the component parts, (4) assembling the component parts into a juicer unit, and (5) packaging the completed units.
(b) Moline ordered raw materials, component parts and outside processing work from third parties, after obtaining bids thereon. Acme did not interfere with Moline’s procurement or fabrication activities nor did it inspect Moline’s plant facilities though it had the right to do so under paragraph 6 of the amended agreement (finding 10). Moline used purchase orders under Acme’s name and invoices were billed directly to Acme. Moline inspected all raw materials, com *394 ponent parts and processing work which, came from outside suppliers to ensure proper quality and workmanship. Acme bore the %% normal spoilage expense of production materials since Acme paid for such materials.
12. Acme paid Moline $10.94 per unit for each delivered juicer, which represented payment for the manufacturing services noted in finding 11. Moline paid no royalties to Acme under Acme’s patents, noted in finding 18. Moline expended time in research and development to improve the juicer, and Acme paid for all development costs and expenses, including expenses for obtaining two patents on certain improvements to the juicer during the period in issue. Acme owns such patents. (Finding 18(c) and (d).) Proposed improvements normally came from Moline and were discussed between Acme and Moline to reach agreement whether the improvements should be incorporated into the juicers. Acme owned the tooling required for the production of the juicers, and paid for major repairing and refurbishing of it, and for replacement. Acme depreciated the tooling and expensed the repairing or refurbishing costs on its income tax return. Acme carried insurance on the tooling. Moline carried insurance on its inventory of undelivered pieces and on its plant facilities.
13. The value of the molds, dies and tooling used to produce the juicer and owned by Acme in I960 was $25,000 to $30,000. As of May 31, I960, the value of Moline’s general shop equipment such as lathes, drill presses, etc., used to fabricate the juicer was approximately $6,000, and the value of Moline’s building, land and general shop equipment was about $67,000.
14. The juicers, as well as the packages containing them, carried the label “Manufactured by Acme Juicer Mfg. Co.” Likewise, Acme was named as manufacturer in advertising literature. Moline was not named on the package, on the juicer itself or in the advertising literature. Acme carried an inventory of juicers and parts, and insurance on its inventory. Moline carried an inventory of finished juicers at its plant as back-up for Acme’s needs. The 10-year guarantee of the juicer was carried in Acme’s name. The trademark “Acme Juicerator” was owned by Acme. The instruction manual enclosed with each juicer was prepared 'and paid for by Acme.
*395 15. The Model 5001 juicer was the original juicer produced by Moline and was produced during the period in issue. Models 6001 and 7001 were introduced in ¡February 1962 and were produced through the period in issue.
16. The price adjustment clause (clause 7(a)) of the parties’ agreement (finding 9) was not invoked by either party during the period in issue, though there is some evidence that Moline from time to time reduced its assembly costs, with commensurate benefits accruing to Moline. Details of such cost reductions are not of record.
17. Momac is a corporation formed by Douglas Moline and another individual in early 1958. Momac supplied Moline with some of the finished component parts for the juicer, such as the bowl, cover, basket, cutter blade, clutch, and stuffer. Acme paid for the raw materials used by Moline, so that Momac’s price to Acme on the finished parts represents Momac’s labor cost and a profit equal to that which an outsider would make, if the outsider furnished the part. Acme benefited by Momac’s existence, since Douglas Moline could better control the quality of the component parts purchased from Momac rather than from others. Douglas Moline benefited by Momac’s existence to the extent he profited from Momac’s sales of component parts for Acme juicers.
18. Acme owns U.S. patents relating to juicers as follows;
(a) Design Patent No. 171,641, issued to Robert D. Dodge, on March 3,1954, relating to the ornamental design of a juicer. The design of the juicers in suit is substantially as shown in the design patent.
(b) Patent No. 2,875,967 (the “gyro-base” patent), filed May 20, 1954, and issued March 3, 1959, to Robert D. Dodge, relating to the base structure for a centrifugal juicer.
(c) Patent No. 3,085,606 (the “floating blade” patent), filed November 27, 1961 and issued April 16, 1963, to Acme, relating to a Motion cutter drive for a juicer.
(d) Patent No. 3,165,132 (the “automatic braking device” patent), filed June 4, 1963 and issued January 12, 1965, to Acme, relating to a cutter drive for a juicer.
*396 19. The “gyro-base” patent describes and claims means to prevent the juicer from moving (or “walking”) around on a table or counter top during operation, due to uneven distribution of pulp in the inner perforated basket and the resulting vibration of the machine as the basket rotates. The patent teaches the use of rubber feet on the bottom of the juicer, the feet being of differing height and unevenly distributed around the circumference of the juicer base. Models 5001, 6001 and 7001 were all made with the gyro-base feature, and the parts relating thereto cost about $2.
20. The “floating blade” patent and the “automatic braking device” patent describe and claim means to eliminate imbalance of the juicer during operation caused by uneven distribution of pulp in the inner basket. The cutting blade is made to change position continuously in relation to the perforated wall of the inner basket, thereby to distribute the pulp more evenly. After development of the “floating blade” and “automatic braking device” improvements, such improvements were incorporated into Models '5001 and 6001, but not Model 7001. The parts relating to the “floating blade” and “automatic braking device” features cost about $1.40.
21. In Acme’s advertising and sales promotion programs, the features described and claimed in Acme’s patents are noted. One sales brochure describes the devices as “Acme’s Patented Juicerator Extractor” and notes that the “gyro-base” feature, being patented, “cannot be duplicated by any other manufacturer for the 17-year patent period.” The brochure also describes the “floating blade” feature as “exclusive.” The device as illustrated in the brochure conforms to the design of Acme’s design patent.
22. During the years in issue, a competitive juicer, called the Atlas juicer, was on the market. The ornamental design of the Atlas juicer is significantly different from that shown in Acme’s design patent, and the Atlas juicer did not have the “gyro-base” feature, though it may for a short time have incorporated a type of “floating blade” feature. On advice of counsel, Acme brought no patent infringement action against Atlas. On the basis of this record, such action would not have been fruitful since it appears that there was no *397 infringement in fact (particularly of the design patent). There is no- evidence, however, suggesting that Acme’s patents are invalid or that they could not have been enforced against infringements in fact.
28. (a) During the years in suit, a competitive juicer made in Harrisburg, [Pennsylvania, was on the market. The evidence is not clear on the details of construction of such juicer. Acme did not seek to enforce its patents against it.
(b) In 1960, there were about 20 competitive juicers on the market which used centrifugal action to extract liquid from fruits and vegetables. There is no evidence relating to the details of such juicers.
24. In 1955, Alfred Leo organized, as sole stockholder, a new corporation called Eastern Acme Juicer Manufacturing Company '(“Eastern Acme”). Between 1958 and 1955, Leo sold Aome juicers as a distributor; and after 1955, 'he continued to sell such juicers through Eastern Acme. In 1955, Eastern Acme had the exclusive distributorship for Acme juicers in 18 states in eastern United States; and by 1959, Eastern Acme had the exclusive distributorship for all the states east of the Mississippi ftiver, except 'Florida.
25. Eastern Acme was a sales organization, employing approximately seven people, which maintained a sales office in Lemoyne, Pennsylvania, with an available inventory of juicers for sale to eastern distributors. Eastern Acme held regional meetings and area meetings for its distributors. It also provided its distributors with national and local direct-mail advertising, brochures and presentation kits. Ninety percent of Eastern Acme’s sales was to distributors and the remaining 10% of sales was to consumers.
26. Between November 2, 1959 and June 30, 1960, Acme sold 4,728 juicers to wholesalers of which 2,150 were sold to Eastern Acme. Between July 1, I960 and June 30,1981, Acme sold 10,107 juicers to wholesalers of which 5,487 were sold to Eastern Acme.
27. On July 16, 1960, Leo purchased all the issued and outstanding stock of Acme from its stockholders for $200,000. ■Leo also acquired Acme’s inventory of juicers. Pursuant to the Stock sale agreement, Kobert D. Dodge, one of the prior stock *398 holders of Acme, assigned U.S. Design Patent 171,641 and TJjS. Patent 2,¡875,067 (the “gyro-base” patent) to Acme. Prior to that time, Dodge owned the patents. Dodge and the other stockholders of Acme refused to sell the stock of Acme to Leo unless Moline was retained to fabricate the juicers.
28. During the period in issue, Acme maintained a sales organization in Los Angeles, California, including local salesmen who sold in the California area. Though Eastern Acme" promoted the juicer through national advertising, direct-mail campaigns and sales promotion kits, Acme shared the costs of promotion for the western states.
29. During the period in issue, Acme’s per-unit cost of the juicers, which includes Moline’s $10.94 fee and the cost of materials of construction paid for by Acme, was approximately as follows:

Model Cost

5001_ $32
6001_ 42
7001_ 31
Moline computed and paid the Federal manufacturer’s excise tax based on such costs.
30.(a) Acme sold the Model 5001 juicer to the following wholesalers:

Wholesaler Bate Sales Price

Eastern. Acme_Jan. 2, 1959 to Aug. 9, 1960 Aug. 9, 1960 to Nov. 14, 1960 Nov. 14, 1960 to Feb. 25, 1963 Feb. 25, 1963 to Sept. 30, 1963 $48.00 42.00 40.00 36.00
Unrelated western Jan. 2, 1959 to wholesalers Nov. 14, 1960 (lowest price) Dec. 20, 1960 to Sept. 30, 1963 $47.90 to 50.00 54.75 to 57.50
(b) The price reduction to Eastern Acme in August 1960 from $48 to $42 per unit was based on the fact that Eastern Acme maintained a large inventory for distribution to the eastern states and that Eastern Acme carried the principal burden of advertising and promotion, though local dealers carried a minor part of the costs.
*399 (c) The price reduction to Eastern Acme in February 1963 from $10 to $36 per unit was based on the fact that Eastern Acme’s profit level was low and that Eastern Acme was paying the cost of national promotion, though it appears from the record that Acme paid its pro rata share of that expense for western promotion.
(d) Generally, the reductions in price from Acme to Eastern Acme were based upon prior practices of Acme to permit or allow the sum of $10 per unit to Acme’s California office for advertising and promotion in the west.
(e) The price increase in December 1960 to certain of Acme’s dealers from about $50 to about $55 per unit was incident to a $10 increase in retail price, of which the dealers profited by $5 and Acme profited by $5.
31. In February 1962, Acme introduced Models 6001 and 7001 juicers. Acme sold Model 6001 to the following wholesalers:

Wholesaler Sate Sales Price

Eastern Acme_Feb. 1962 to Feb. 25, $50.00 1963 Feb. 25, 1963 to 46.00 Sept. 30, 1963
Unrelated western Feb. 1962 to Sept. 30, 67.75 to 69.75 wholesalers 1963 (lowest price)
Acme sold Model 7001 to the following wholesalers:

Wholesaler Sate Sales Price

Eastern Acme_Feb. 1962 to Feb. 25, $38.00 1963 Feb. 25, 1963 to 34.00 Sept. 30, 1963
Unrelated western Feb. 1962 to Sept. 30, 47.25 to 49.75 wholesalers 1963 (lowest price)
32. Eastern Acme sold the juicers to its distributors in the east at the same prices as Acme sold the juicers to its unrelated wholesalers in the west. For example, when Acme sold a Model 6001 juicer to an unrelated western wholesaler for $67.75 (Acme’s cost being $42), Eastern Acme sold the identical juicer to one of its distributors for $67.75 (Eastern Acme’s cost from Acme being about $46).
*400 33. (a) The retail prices for the juicers were as follows:

Model Dale Retail Price

5001_ Jan. 1959 to Dec. 20, 1960_ $99. 00 Dec. 1960 to 1963_ 109. 95
Feb. 1962 to Sept. 30, 1963_ 139. 95 o
Feb. 1962 to Sept. 30, 1963_ 89. 95 o
(b) Acme did not include the manufacturer’s excise taxes assessed against it in the price of its product, nor has it collected the amount of excise taxes assessed against it from its purchaser or purchasers.
Ultima™ FINDINGS AND CoNClusions
34. Section 4121 of the 1954 Internal Revenue Code imposes upon the “sale by the manufacturer, producer or importer” of household-type electric juicers a tax of “5 percent of the price for which so sold.” 'Section 316.4 of Treas. Reg. 46 (1940 ed.), which was made applicable to the 1954 Code by t.d. 6091, 1954-2 Cum. Bull. 47, defines “manufacturer” as follows:
* * * The term “manufacturer” includes a person who produces a taxable article from scrap * * * as well as from new or raw material, (1) by processing, manipulating, or changing the form of an article, or (2) by combining or assembling two or more articles.
Under certain circumstances, as where a person manufactures or produces a taxable article for a person who furnishes materials and retains title thereto, the person for whom the taxable article is manufactured or produced, and not the person who actually manufactures or produces it, will be considered the manufacturer.
* * * * #
35. Acme, and not Moline Manufacturing Company, was the “manufacturer” of the juicers in issue, within the meaning of Code and Regulations and during the pertinent years, for the following reasons:
(a)i Moline’s only business was fabricating juicers for Acme; Moline in fact made juicers only for Acme; and, by contract, Moline was not permitted to make juicers for anyone else so long as Acme met a minimum-quantity require *401 ment which, so far as the record shows, was always met. (Findings 7-11.) Polaroid Corp. v. United States, 235 F. 2d 276 (1st Cir. 1956), cert. denied, 352 U.S. 953.
(b) Acme owned a design patent which covered the ornamental features of the three juicers in issue. Moline paid no royalty to Acme under such patent, and the record does not show that the patent was invalid or unenforceable. (Findings 12,18(a), 21,22.) Polaroid, supra.
(c) Acme owned a patent (the “gyro-base” patent) which described and claimed an improvement in juicers. Such improvement was incorporated in all the juicers in issue. Moline paid no royalty to Acme under such patent and the record does not show that the patent was invalid or unenforceable. (Findings 12,18(b), 19, 21, 22.) Polaroid, supra.
(d)1 During the years in issue, Douglas Moline made two improvement inventions (“floating blade” and “automatic braking device”) which were incorporated into two of the juicer models in .issue. The inventions were patented by Moline and the patent rights were assigned to Acme in accordance with the parties’ contract. Moline paid no royalty to Acme .under such patents. The record does not show that the patents were invalid or unenforceable. (Findings 12,18 (c) and (d), 20-22.) Polaroid, supra.
(e)1 Moline could not have made, used or sold the juicers in .issue for anyone else without a license from Acme under the design patent and the “gyro-base” patent. Nor could Moline have made Models 5001 and 6001 juicers for anyone else without a license from Acme under the improvement patents (“floating blade” and “automatic braking device”). 35 U.S.C. § 271 (a). Acme never granted Moline such patent licenses, royalty-free or otherwise. Warner-Patterson Co. v. United States, 68 Ct. Cl. 237 (1929); Charles Peckat Mfg. Co. v. Jarecki, 196 F. 2d 849 (7th Cir. 1952), cert. denied, 344 U.S. 875; Polaroid, supra; cf. Air Lift Co. v. United States, 286 F. Supp. 249 (W.D. Mich. 1968), aff’d. 418 F. 2d 558. Whether Moline could have made a suitable and marketable juicer without incorporating the features of Acme’s *402 patents is speculative and irrelevant to the issues here presented.
(f) Acme furnished to Moline all special tooling for making the juicers, and Acme owned the tooling. Acme was responsible for repairing and replacing it, as necessary, and carried insurance on it. (Findings 8, 9, 12, 13.) Warner-Patterson Co., supra; Peckat, supra; Polaroid, supra; cf. Air Lift Co., supra.
(g) Acme paid for all raw materials and services incident to making the juicers. Moline ordered the materials and services on Acme’s order forms as Acme’s agent, and Acme paid all vendors directly. Acme relied on Moline to order materials and services and to see that quality control was maintained, all of which was Moline’s responsibility pursuant to the manufacturing fee paid by Acme to Moline. (Findings 9-12.) Cf. Polaroid, supra; Air Lift Co., supra.
(h) Improvements made to the juicers, and any patents resulting therefrom, were the property of Acme, pursuant to the parties’ agreement. Acme paid all costs of research and development leading to improvements. Whether improvements were actually incorporated into marketable juicers was a joint decision reached after consultation between Acme and Moline. So far as the record shows, Moline made no changes in the juicers without agreement and acquiescence of Acme. (Findings 9, 10,12.)
(i) Acme paid Moline a flat fee of $10.94 for fabricating the juicers. Pursuant to their contract, such fee was adjustable up or down depending on changes in labor costs. Since Acme paid for all component parts plus a service fee variable with labor costs, Moline assumed no major profit or loss risk in fabricating the juicers. So far as the record shows, the fee was never adjusted. (Findings 9, 10, 12, 16.) Polaroid, supra; cf. Air Lift Co., supra.
(j) In all advertising and promotion literature, Acme was noted as the manufacturer of the juicers; Acme owned the trademark “Acme”; all juicers carried the “Acme” name; the instruction books carried the “Acme” name; and Acme war *403 ranted the juicers under the “Acme” name. (Findings 14,21.) PecJeat, swpra.
38. (a) Moline’s transfer of juicers to Acme did not constitute a “sale” within the meaning of § 4121 of the 1954 Internal Revenue Code. Peckat, supra.
(b) The first “sale” of the juicers, within the meaning of the Code, occurred when Acme transferred the juicers to its wholesale distributors. PecJeat, supra; Polaroid, supra; see also Carbon Steel Co. v. Lewellyn, 251 U.S. 501 (1920); Record Guild of America, Inc. v. United States, 145 Ct. Cl. 686 172 F. Supp 676 (1959).
37. Section 4216(b) of the 1954 Internal Revenue Code provides as follows:
SEC. 4216 DEFINITION OF PRICE.
‡ * * #
(b) CONSTRUCTIVE SAEE PRICE. — ® an article is
(1) sold at retail,
(2) sold on consignment, or
(3) sold (otherwise than through an arm’s length transaction) at less than the fair market price,
the tax under this chapter shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary or his delegate.
:f: if: ^ % íJí
Section '316.Í5 of Treas. Reg. 46 (1940 ed.), which was made applicable to the' 1954 Code by t.d. 6091, 1954-2 Cum. Bull. 47, states as follows:
SEC. 316.15 Fair marJcet price m case of retail sales, consignments, etc., generally.- — The law provides a special basis of tax computation where sales are at less than the fair market price and not at arm’s length. The fair market price is the price for which articles are sold by manufacturers at the place of distribution or sale in the ordinary course of trade and in the absence of special arrangements. A sale is not at arm’s length when made pursuant to special arrangements between a manufac *404 turer and a purchaser (as in the case of intercompany transactions). When a sale is not at arm’s length and the price is less than the fair market price (as in the case of intercompany transactions at cost or at a fictitious price), the tax is to be computed upon a fair market price to be computed by the Commissioner. No deduction from the fair market price as determined by the Commissioner is permissible.
*****
38. (a) 'Since July 16, 1960, Acme and Eastern Acme have been solely owned by Alfred Leo and thus were related corporations. (Findings 24,27.) Accordingly, sales of juicers by Acme to Eastern Acme were not arm’s length transactions, but rather were intercompany transactions motivated in substantial part by a desire to increase Eastern Acme’s profits ; and the price of such sales was not the price for which the juicers were sold “in the ordinary course of trade” at fair market value within the meaning of § 4216 of the 1954 Internal Eevenue Code. (Findings 30-82.)
(b) Acme sold juicers to unrelated wholesale distributors in the ordinary course of trade at prices noted in findings 30-32. Such sales were arm’s length transactions and were without special arrangements; and the price of such sales constitutes the constructive sales price for purposes of calculating the excise tax due on Acme’s sales to Eastern Acme, pursuant to ,§ 4216 of the 1954 Internal Revenue Code. Kin-Septic Co. v. United States, 105 Ct. Cl. 594, 64 F. Supp. 142 (1946); Ayer Co. v. United States, 93 Ct. Cl. 386, 38 F. Supp. 284 (1941).
(c) There is no evidence that Acme made sales to unrelated wholesale distributors in arm’s length transactions at prices lower than noted in findings 30-32. Accordingly, such prices are deemed to be the lowest price.
CoNclusioN or Law
Upon the foregoing findings of fact and memorandum opinion, which are made part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and plaintiff’s petition is dismissed.